## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| V. | § § § | A-13-CV-1036 ML |
| ROBERT A. HELMS, ET AL., | § § § | |
| Defendants, | § § | |
| and | § § | |
| WILLIAM L. BARLOW and GLOBAL CAPITAL VENTURES, LLC, | § § § | |
| Relief Defendants, solely for the purpose of equitable relief. | § § | |

## <u>ORDER</u>

Before the Court are Receiver's Motion for Entry of an Order (1) Rejecting Secured Claim of Clovis Capital Ventures, LLC ("Clovis"), and (2) Authorizing Sale of Certain Royalty Interests Free and Clear of All Liens, Claims, and Encumbrances, filed August 29, 2014 (Clerk's Dkt. No. 95); Clovis' Response to Doc. No. 95, filed September 22, 2014 (Clerk's Dkt. No. 113); Receiver's Reply in Support of Doc. No. 95, filed September 29, 2014 (Clerk's Dkt. No. 119); Receiver's Motion for Entry of Order Confirming Sale of Certain Oil and Gas Interests of Receivership Estate and Receiver's Motion to Expedite Treatment of Previously Filed Motions, filed September 18, 2014 (Clerk's Dkt. No. 110); Clovis' Motion to Intervene in Response to Doc. Nos. 88 and 110, filed October 3, 2014 (Clerk's Dkt. No. 127); Receiver's Reply in Support of Doc. No. 110, filed October 6, 2014 (Clerk's Dkt. No. 131); Receiver's Pre-Hearing Brief,

filed February 6, 2015 (Clerk's Dkt. No. 186); and Clovis' Pre-Hearing Brief, filed February 6, 2015 (Clerk's Dkt. No. 191).

The parties consented to this Court's jurisdiction, and the case was assigned to this Court's docket for all purposes on September 29, 2014.   (Clerk's Dkt. No. 118).   Having considered the briefing and the applicable case law, the Court issues the following order.

## I.   PROCEDURAL BACKGROUND

On December 3, 2013, the Securities and Exchange Commission ("SEC") filed an action against Robert A. Helms ("Helms"), Janniece S. Kaelin ("Kaelin"), Deven Sellers ("Sellers"), Roland Barrera ("Barrera"), and a number of entities ("Defendant Entities") (collectively, "Defendants").   The complaint alleged Defendants were engaged in securities fraud and sought appointment of a receiver.   That same day, the Court entered a Temporary Restraining Order restraining and enjoining the Defendants from further violations of the Anti-Fraud and Broker-Dealer registration provisions of federal securities laws.   (Clerk's Dkt. No. 10).   The Court also entered an order appointing Thomas L. Taylor III ("Receiver") as Receiver for the Defendants. (Clerk's Dkt. No. 11).   The appointment order granted the Receiver authority to marshal and preserve Defendants' assets for the benefit of the Receivership Estate.

The Receiver began marshaling Defendants' assets, which included two overriding royalty interests owned by defendant Vendetta Royalty Partners, LTD. ("Vendetta Partners") in oil and gas producing properties in Crocket and Schleicher Counties, Texas ("Ozona Interests"). (*See* Ex. R-5)   The Receiver sought and was granted the authority to sell oil and gas interests included within the Receivership Estate, subject to the Court's confirmation prior to closing the sale.   (Clerk's Dkt. Nos. 69, 77 ("Sales Order")).   The Receiver thereafter moved the Court to confirm the sale of the Ozona Interests free and clear of all liens, claims, and encumbrances.

(Clerk's Dkt. Nos. 95 and 110).  Clovis Capital Ventures, LLC ("Clovis"), a non-party to the lawsuit, filed two motions to intervene in the case, arguing it has a perfected security interest in the Ozona Interests.  (Clerk's Dkt. Nos. 99 and 127).

On October 22, 2014, the Court held a hearing on various motions, including the Receiver's motions to authorize and confirm the sale of the Ozona Interests and Clovis' Motions to Intervene in the instant action.  During the hearing, the Court expressed its intent to conduct an expedited, quasi-bench trial regarding Clovis' purported security interest in the Ozona Interests.  The Court therefore granted Clovis' Motion to Intervene in the action "for the limited purpose of addressing issues relating to Clovis' purported security interest."[1]  (Clerk's Dkt. No. 146 at 2).  The Court issued an ancillary scheduling order, which set forth deadlines for discovery, alternative dispute resolution, and briefing relating to Clovis' purported security interest.  (Clerk's Dkt. Nos. 149, 179).  The parties submitted briefing on the Clovis issue, and the Court conducted a quasi-bench trial on February 12, 2015.

## II.   FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence presented, including both witness testimony and trial exhibits presented at the quasi-bench trial on February 12, 2015.  The parties called Danielle Supkis-Cheek ("Cheek"), Douglas Smith ("Smith"), and Philip Gaucher ("Gaucher") to testify.

### A.  Background

Defendants Helms and Kaelin operated Vendetta Partners and the Defendant Entities. Vendetta Partners was organized and marketed as a standard limited partnership that would hold and distribute royalty interests from approximately 2,000 oil and gas wells located principally in

---

[1] Clovis states that although it initially accepted the Receiver's characterization of its interest as a security interest, Clovis' preliminary analysis suggests it is an assignment of a real property interest.  Nevertheless, Clovis concedes the issue before the Court is whether an interest in the Ozona Interests belongs to Clovis.  (*See* Clovis Brief at 5 n.4).

Texas ("Vendetta Portfolio").  Vendetta Partners began soliciting investors in at least July 2011. In the summer of 2012, Bill Brock ("Brock") approached Gaucher about an investment in Vendetta Partners. (Gaucher Depo. 6:3–6; 8:16–18).  Gaucher, along with Smith and Avery Chapman ("Chapman") formed Clovis, through entities they each owned and controlled, for the exclusive purpose of investing in Vendetta Partners.

### B.  Clovis Investment

Clovis was a late investor in Vendetta Partners. Prior to investing, Gaucher, Smith, and Chapman received the Private Placement Memorandum ("PPM") for the Vendetta Partners offering of limited partnership interests ("Vendetta Offering"), Vendetta Partners Subscription Agreement ("Subscription Agreement"), and Vendetta Partners Limited Partnership Agreement ("Partnership Agreement")).  (*See* Exs. R-3 (PPM), R-11 (Subscription Agreement), R-4 (Partnership Agreement).  Gaucher and Chapman traveled to Vendetta Partners' office on two occasions to investigate the Vendetta Offering.  (Gaucher Depo. 34:11–13).  Gaucher thereafter prepared an Investment Memorandum to the other Clovis members.  (Gaucher Depo. 39:19–25; 40:1; Ex. R-17).  The Investment Memorandum explained Clovis' investment would be used to purchase additional key oil and gas producing properties, which would increase its attractiveness to and facilitate the sale of the partnership or the Vendetta Portfolio to an institutional investor. (Ex. R-17).  Gaucher projected Clovis would receive 250 percent to 300 percent or more return on its invested capital in Vendetta Partners and recommended Clovis invest.  (*Id.* at 1).

On November 30, 2012, Clovis subscribed to the Vendetta Offering, and transferred $1,150,000 to Vendetta Partners.  (Cheek Decl. ¶ 15(a)).  The Clovis Subscription Agreement was executed by Chapman on behalf of Clovis.  (Ex. R-11).  Clovis made additional investments with Vendetta Partners of $1,180,000 on December 17, 2012, and $555,000 on January 24, 2013.

(*Id.* ¶ 15(b)–(c)).  Clovis ultimately invested $2.885 million in Vendetta Partners in exchange for its limited partnership interest and to allow Vendetta Partners, Clovis understood, to purchase additional properties for the Vendetta Portfolio.  (Gaucher Depo. 33:8–9).

In order to induce Clovis to make its investment of $2.885 million, Helms and Kaelin agreed that Clovis' investment could be secured by certain properties in the Vendetta Portfolio. On November 30, 2012, Chapman, on behalf of Clovis, and Vendetta Royalty Management, LLC ("Vendetta Management"), as general partner of Vendetta Partners, executed the Side Letter Agreement ("Side Letter").  (Ex. I-32).  Under the terms of the Side Letter, the Ozona Interests would be transferred to Clovis upon certain "trigger events."  (*Id.* at 3–4).  For example, if the contemplated sale of the Vendetta Portfolio failed to close on February 28, 2013, Clovis, at its election, could liquidate the interests and retain an amount of the proceeds not to exceed the amount of its original investment. (*Id.* at 3).  At the time Clovis entered into the Side Letter, Chapman was aware that Vendetta Partners had an existing credit facility with Amegy Bank N.A. ("Amegy").  (Helms Depo 134:8–135:9; Ex. R-10).  Clovis would not have invested in Vendetta Partners but for its ability to obtain this collateral.

In accordance with the terms of the Side Letter, Vendetta Partners executed a Collateral Assignment of Overriding Mineral Interests Assignments pursuant to which Vendetta Partners agreed to collateralize and place into third party escrow two Assignment, Conveyance, and Mineral Deeds in favor of Clovis to secure its capital contributions to Vendetta Partners. (Exs. I-33, I-34).  These deeds were executed by Vendetta Partners as Grantor in favor of Clovis on November 30, 2012.  (Ex. R-14).  Notices of Interest related to the property interests conveyed by Vendetta Partners, and executed by both Clovis and Vendetta Partners were recorded in the real property records of Crockett and Schleicher counties.  (Exs. I-35, I-36).  Vendetta Partners

5

transferred 6% of Clovis' capital contribution to Brock and Gaucher as commission for soliciting Clovis' investment, equaling approximately $86,550 to each.  (Cheek Decl. ¶ 21(a)). The PPM limited "Promotional Expenses" to 0.1% of all proceeds raised in the Vendetta Offering.  (Ex. R-3).  The PPM also limited proceeds raised in the Vendetta Offering to $50,000,000.

### C.  Vendetta Operations

The forensic accountant Danielle Supkis Cheek ("Cheek"), engaged by the Receiver, testified in a sworn declaration that she believes Vendetta Partners operated as a Ponzi scheme. (Ex. R-1 ("Cheek Decl.")).   Cheek is the President of D. Supkis Cheek, PLLC, a forensic accounting firm, and is a Certified Public Accountant, Certified Fraud Examiner, and Certified Valuation Analyst. (*Id.* at 1).  Cheek identified the following activities and practices between and among Vendetta Partners and other defendants in this case as fraudulent and in furtherance of a Ponzi scheme.

On August 17, 2011, $187,836 was withdrawn from a Vendetta Partners' bank account to make a partnership distribution to a limited partner.  (*Id.* at 7).  The only source of these distributed funds was invested capital of other limited partners.  (*Id.*).  On January 25, 2012, a $650,000 partnership distribution was made to a limited partner. (*Id.* at 7–8).  The only source of these distributed funds was from invested capital of other limited partners.  (*Id.*).  Prior to the November 30, 2012 Clovis investment, Vendetta Partners had an account balance of $99,730.35. On November 30 and December 1, 2012, Vendetta Partners issued checks to limited partners as partnership distributions in amounts totaling approximately $222,000.  (*Id.* at 8).  The source of approximately $122,000 of these distributed funds was from the invested capital of Clovis.  (*Id.*). Between December 6 and 8, 2012, Vendetta Partners made partnership distributions of approximately $256,000.  (*Id.* at 9–10).   The source of these distributed funds was from the

invested capital of Clovis, which had been transferred from Vendetta Partners to accounts of Relief Defendants on November 30, 2012 and then transferred back to Vendetta Partners from accounts of Relief Defendants on December 3 and 4, 2012.  (*Id.* at 8–10).

During the hearing on February 12, 2015, Cheek reiterated and summarized the findings in her declaration.  Cheek testified that all of the Defendant Entities were operating at losses. She further testified that the only major spikes in Vendetta Partners' income were from investor inflows from new investor money.  Those investments were used to pay distributions to existing investors, rather than invest in new mineral assets.  When asked whether investor distributions could have been made from Vendetta Partners' cash reserves, Cheek posited that it was possible, but that Vendetta Partners' cash balances were ordinarily low, therefore it was unlikely.

Even if a portion of Vendetta Partners' business was a legitimate business operation with legitimate royalty interests, Cheek testified, the distributions to limited partners were still largely paid out of investor funds.[2]  According to Cheek's testimony, defendants Helms and Kaelin commingled funds, including proceeds from investors, among accounts of the Defendants and used such funds for the payment of debts and unauthorized expenditures on behalf of Helms and Kaelin.  Although Vendetta Partners raised over $30 million through Clovis and other investors, the net result of the inter-company cash transfers among the Defendants is a negative $2,751,545.40.  Neither Vendetta Partners nor assets of the Vendetta Portfolio were ever sold to a buyer.  In open court, Cheek reiterated her conclusion that Vendetta Partners operated a Ponzi scheme.

---

[2] On cross-examination of Cheek, Helms asked questions regarding the royalties income from the mineral assets.  Helms indicated that the proceeds were higher than what Cheek projected in her analysis and that Vendetta Partners divested a number of wells.  He criticized Cheek's admission that she did not analyze the check detail for each well, which sometimes ran hundreds of pages.  He also pointed out that Vendetta Partners incurred expenses for engineers and land work.  Nevertheless, as discussed *infra*, the fact that some of a business' operations are legitimate does not necessarily negate the existence of a Ponzi scheme.

Clovis' counsel and Helms each cross-examined Cheek regarding her experience and training investigating Ponzi schemes, the definition of a Ponzi scheme, and the charts included in her declaration. However, neither seriously questioned Cheek's qualifications or credibility, and neither presented an expert to offer an opposing opinion. Therefore, the Court finds Cheek's live testimony and declaration testimony to be credible and persuasive.

### D.  Clovis' Due Diligence

During the quasi-bench trial, Smith testified regarding his role in the Vendetta Partners investment. Smith is a successful self-taught businessman and investor, although he does not have experience investing in oil and gas assets. He invested approximately $2.86 million in Vendetta Partners through Clovis. Smith testified that when conducting due diligence for investments, he generally hires experts such as attorneys and business professionals to conduct due diligence on his behalf. He further testified that he relied on Chapman and Gaucher to conduct the due diligence of the Vendetta Partners investment. Smith frequently conferred with Gaucher and Chapman, and asked them lots of questions regarding the investment before investing. He also was often involved in conference calls between Gaucher and Kaelin.

Smith contended that the high return on investment also induced his decision to invest. According to Smith's testimony, way the profits would be realized, when explained to him, seemed legitimate. Vendetta Partners' plan to aggregate its oil and gas interests and sell to an institutional investor appeared to be innovative and novel. Smith testified that he understood his investment was risky, but that it was a calculated risk, and he would not have invested without collateralizing his investment. He conceded that the rate of return was not necessarily "normal" but remarked that Clovis conducted due diligence as a result of the abnormality. Smith admitted that Clovis' operational and financial due diligence was limited to the analysis of Chapman and

Gaucher.  Further, Smith admitted he did not read the Partnership Agreement or the PPM, and instead relied on Chapman to read and decipher those documents.  Nor did he examine Vendetta Partners' financial records. Smith's testimony was consistent with his prior deposition testimony. Therefore, the Court finds his testimony is credible.[3]

During the quasi-bench trial, Gaucher advised that he performed due diligence regarding the financial aspects of Clovis' investment.  Gaucher has an extensive background as an investment banker, although he admits he is inexperienced in investing in private equity or oil and gas assets.  As part of his due diligence, Gaucher discussed in detail Vendetta Partners' operations and assets with Kaelin and Helms.  He asked a colleague if anyone in the "marketplace" had heard of Kaelin, and his colleague replied that she had a good reputation as a credible entrepreneur.  Gaucher twice visited Vendetta Partners' office in Austin, Texas, and noticed Vendetta Partners appeared to employ numerous people who had specific roles.  He testified that he also spoke with the purported institutional buyer, Resource Select.

Gaucher testified that at the time Clovis invested, he did not know Vendetta Partners was a Ponzi scheme, or otherwise conducting fraudulent transactions.  Gaucher maintained he had believed Helms' and Kaelin's representations that Vendetta Partners had $26 or $30 million in assets.  According to Gaucher, the high yield potential of the investment was realistic because Vendetta acquired mineral royalties that when aggregated could be sold to an institutional investor.  He further testified that he believed the security interest Clovis acquired was valid.

Gaucher contended that he believed the investment opportunity came to him from credible people, but he wished he had done more thorough due diligence.  He admitted that he

---

[3] Smith concluded that he did not and still does not necessarily believe Vendetta Partners was a Ponzi scheme, although he now believes Vendetta Partners engaged in fraudulent activities.  However, the Court disregards Smith's belief that Vendetta Partners may not have been a Ponzi scheme, as he was not offered as an expert on the subject, he offered no support for his conclusion, and his conclusion was in direct conflict with the manner in which Vendetta Partners operated.

did not read the PPM or Partnership Agreement, and that the majority of the legal due diligence was conducted by Chapman. When the Court asked him whether he and Smith relied on Chapman, Gaucher responded that "everyone" relied on Chapman.  The Court finds Gaucher's testimony to be credible.  His testimony was consistent with his prior deposition testimony and there was no impeachment evidence presented during the quasi-bench trial.

Nevertheless, the Court finds Gaucher did not effectively examine, test, or audit the operations of Vendetta Partners.  For example, Gaucher admitted he did not independently review or audit any of Vendetta Partners' financial records.[4]  His due diligence appears to have relied exclusively on either what he was told by Helms and Kaelin, or on financial documents and projections provided by Vendetta Partners.  An effective and independent examination of Vendetta Partners simply was not done.

Due to a pending legal dispute between Smith and Chapman, Chapman did not appear for the quasi-bench trial and Clovis did not call him as a witness.[5]  Chapman is a licensed attorney who at times acted as counsel for Clovis. According to the evidence before the Court and the testimony during the quasi-bench trial, Chapman reviewed the PPM, reviewed the Partnership Agreement, entered into the Side Letter, investigated the Amegy credit facility, and drafted and filed the Notices of Interest.  In his deposition, Chapman testified that he would not "characterize [his] involvement as having been involved in the [financial] due diligence process."  (Ex. I-14 ("Chapman Depo.") 20:20–22).  He further stated that he was unaware of "what promotional expenses were or costs," regarding Gaucher's commission for the investment in Vendetta Partners.  Finally, Chapman testified in his deposition that he was unaware of whether the other

---

[4] Gaucher testified that he was present when Chapman asked to see checks from Vendetta Partners' properties and when Chapman pulled Vendetta partners' deeds.  However, he admitted he was not personally involved in that aspect of due diligence.

[5] *Smith et al. v. Chapman et al.*, Civ. Case No. 3:14-cv-238-FDW-DSC (W.D.N.C. 2014).

limited partners received collateral.  According to his deposition testimony, he only knew that collateral was offered to Clovis in order to make them comfortable with the investment. (Chapman Depo. 75:6–11).  Chapman's deposition testimony, coupled with the testimony of Smith and Gaucher, lead the Court to find that little, if any, due diligence was conducted by Clovis.

## III.  APPLICABLE LAW

To void a transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), the Receiver has the burden to prove the elements as to each fraudulent transfer by a preponderance of the evidence.  A transfer is fraudulent "if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." *Janvey v. Brown*, 767 F.3d 430, 438 (5th Cir. 2014) (quoting TEX. BUS. & COM. CODE § 24.005(a)(1)). Accordingly, the Receiver must show the debtor–transferor, here Vendetta Partners, made the transfer to Clovis with actual intent to defraud any of Vendetta Partners' creditors. *Id.* at 438–39 (quoting *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011)).

In the Fifth Circuit, the existence of a Ponzi scheme creates the presumption that a transfer is made with actual intent to defraud the transferor's creditors. *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).  This is because a Ponzi scheme, "as a matter of law, insolvent from its inception." *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012) (quoting *Byron*, 436 F.3d at 558).  "'[T]he transferee's knowing participation is irrelevant under the statute' for purposes of establishing the premise of . . . a fraudulent transfer." *Brown*, 767 F.3d 439 (quoting *S.E.C. v. Resource Dev. Intern., LLC*, 487 F.3d 295, 301 (5th Cir. 2007)). Accordingly, if the Receiver can establish that Vendetta Partners was a Ponzi scheme by a

preponderance of the evidence, the Court will presume that Vendetta Partners had actual intent to defraud.

Once the Receiver establishes the existence of a Ponzi scheme, the burden shifts to Clovis to establish any applicable TUFTA affirmative defenses by a preponderance of the evidence. *Am. Cancer Soc'y*, 675 F.3d at 527. *See GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 301 (5th Cir. 2014) (recounting the district court's jury instruction regarding burden to show good faith). Clovis may shield itself from the Receiver's claims if it proves it received transfers from Vendetta Partners in good faith and in exchange for reasonably equivalent value. TEX. BUS. & COM. CODE § 24.009(a); *Byron*, 436 F.3d at 558 (quoting Uniform Fraudulent Transfer Act ("UFTA") § 19.40.081).

## IV.   CONCLUSIONS OF LAW

Having made the above findings of fact, the Court makes the following conclusions of law regarding Clovis' purported security interest in the Ozona Interests.

### A.   Receiver's Burden: Intent to Defraud

The Receiver contends Vendetta Partners operated as a Ponzi scheme. A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Alguire*, 647 F.3d at 597 (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)); *see also United States v. Setser*, 568 F.3d 482, 486 (5th Cir. 2009) ("[I]n a classic Ponzi scheme, as new investments [come] in . . . , some of the new money [is] used to pay earlier investors.").

The evidence establishes that at some point prior to the Clovis investment, Vendetta Partners became a classic Ponzi scheme. That is, a scheme wherein investors are promised high

returns on their investments, and prior investors are paid distributions from new investors' contributions, rather than a legitimate, underlying business concern. *See Janvey v. DSCC, Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) ("A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008))).  As the Receiver points out, "[t]he most common characteristic [of a Ponzi scheme] which appears to be almost invariable, is a promise of a high rate of return on the funds." *In re LLS Am., LLC*, 2013 WL 3305393, at *7 (Bankr. E.D. Wash. July 1, 2013) (listing examples of high rate of return, including "20 percent return every 90 days," "15 to 18 percent per annum," and "10 to 20 percent per month return" (internal citations omitted)).  *See also DSCC, Inc.*, 712 F.3d at 188 (describing Ponzi scheme as including "high rates of return purportedly guaranteed by the [certificates of deposit]").  Similarly, commingling of funds, which occurred here, is a common characteristic of a Ponzi scheme. *In re LLS Am., LLC*, 2013 WL 3305393, at *7.

The likelihood that Vendetta Partners conducted some legitimate business operations does not counteract the existence of a Ponzi scheme because the distributions made to investors were nevertheless funded by other investors' money. *See DSCC, Inc.*, 712 F.3d at 188 (finding Ponzi scheme where vast majority of money raised was not used to invest in securities); *In re Twin Peaks Fin. Serv's Inc.*, 516 B.R. 651, 655 (Bankr. D. Utah 2014) ("The fact that an investment scheme may have some legitimate business operations is not determinative.  If the debtor's legitimate business operations cannot fund the promised returns to investors, and the payments to investors are funded by newly attracted investors, then the debtor is operating a

Ponzi scheme."). *See also Quilling v. Schonsky*, 247 F. App'x 583 (5th Cir. 2007) (Receiver's affidavit is sufficient evidence to establish existence of Ponzi scheme).

Accordingly, the Court easily concludes the Receiver has established by a preponderance of the evidence that Vendetta Partners was a Ponzi scheme.[6]  The Court thus presumes the transfer of the security interest in the Ozona Interests from Vendetta Partners to Clovis was made with actual intent to defraud.  *Byron*, 436 F.3d at 558 (existence of Ponzi scheme satisfies Receiver's burden of showing fraudulent scheme).  Having found the Receiver met its burden to establish Vendetta Partners' actual intent to defraud, the burden shifts to Clovis to prove any affirmative defenses under TUFTA.

### B.    Clovis' Burden: Affirmative Defense

Under TUFTA, a transfer is not voidable as fraudulent under Section 24.005(a)(1) if the transferee took in good faith and for reasonably equivalent value.  TEX. BUS. & COM. CODE § 24.009. Clovis therefore must show by a preponderance of the evidence it received the transfer of the security interest in the Ozona Interests in good faith and for reasonably equivalent value.

#### 1.    Reasonably Equivalent Value

Clovis maintains its $2.885 million investment in Vendetta Partners was an exchange of reasonably equivalent value to collateralize the Ozona Interests.  Pursuant to TUFTA, "[v]alue is given for a transfer or obligation if, in exchange for the transfer . . . an antecedent debt is secured or satisfied."  TEX. BUS. & COM. CODE § 24.004(a).   The primary consideration when determining whether an exchange is for reasonably equivalent value is "the degree to which the transferor's net worth is preserved."  *Byron*, 436 F.3d at 560 (citing *Butler Aviation Int'l v. Whyte*, 6 F.3d 1119, 1127 (5th Cir. 1993)).  Texas looks to state and federal law for guidance

---

[6]  Although Clovis did not concede Vendetta Partners was a Ponzi scheme, Clovis' proposed findings of fact specifically state that Vendetta Partners used Clovis' investment to pay partner distributions among existing limited partners and to pay Vendetta Partners expenses, rather than invest in new mineral interests.

regarding what qualifies as "reasonably equivalent value." *See In re Hinsley*, 201 F.3d 638, 643, (5th Cir. 2000) (noting that states adopting UFTA interpret it similarly to the 11 U.S.C. § 548 of the Bankruptcy Code).

Capital contributions and other investments alone are generally insufficient to convey reasonably equivalent value. *Warfield v. Carnie*¸ 2007 WL 1112591, at *12–13 (N.D. Tex. Apr. 13, 2007) (investment contracts entered into with hope of receiving profit rather than providing loan did not convey reasonably equivalent value). In their brief and in open court, Clovis conceded its capital contribution to Vendetta Partners was structured as an investment, rather than a loan. *See generally In re Thunderdome Houston Ltd. P'ship*, 2000 WL 889846 (Bankr. N.D. Ill. 2000) (return of capital contributions to limited partners was not payment of debt). Similarly, Clovis' capital contribution does not appear to be "reasonably equivalent value" because prior investors who received the same sharing percentage from Vendetta Partners for their contributions did not receive a security interest. Clovis received regular quarterly partnership distributions as a limited partner, although they were characterized as "accrued interest." (*See* Ex. R-13). It therefore appears Clovis' contribution was to invest as a Class A Limited Partner, rather than secure a debt, and it also appears that no additional value was given for the added security interest. *See Alguire*, 2013 WL 2451738, at *10 (citing TEX. BUS. & COM. CODE §24.004) (under UFTA statutes, value is defined in reference to debt).

However, Clovis' investment is somewhat distinguishable from a standard capital contribution because it sought to contractually collateralize its interest to ensure repayment, similar to a loan. *See, e.g., Carnie*¸ 2007 WL 1112591, at *12–13 (distinguishing loans from standard investment contracts, which do not seek full repayment, and thus do not convey reasonably equivalent value). Clovis' collateralized investment could accordingly be

15

characterized as a debt instrument. *See id.* (value is given when securing or satisfying antecedent debt). Further, as Clovis notes, "A security interest always qualifies as reasonably equivalent value because a secured creditor is not allowed to collect more than the amount of debt for which the security interest provides collateral." (Clovis Brief at 18–19). Like a loan, a "trigger event" would allow Clovis to recover its full investment, and any excess would have gone to Vendetta Partners. *See Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (generally, defrauded investor in Ponzi scheme has given value to debtor in exchange for the principal return on investment, but not for any payment in excess of principal).

Finally, Clovis maintains its investment was more valuable to Vendetta Partners than the other investors' because it came at the very end of the Vendetta Partners enterprise and was more meaningful than earlier investments. While Clovis' $2.885 million investment could plausibly be characterized as an exchange of reasonably equivalent value for the Ozona Interests, the Court need not decide this issue because the Court finds Clovis fails on the "objective good faith" prong of its affirmative defense.

### 2.     *Objective Good Faith*

Clovis contends it acquired a security interest in the Ozona Interests in good faith. Objective good faith "is determined by looking at what the transferee 'objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.'" *Byron*, 436 F.3d at 560 (quoting *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995)). Put another way, a transferee does not act in good faith if there are sufficient facts that should put him on inquiry notice of a debtor's possible insolvency. *In re Sherman*, 67 F.3d at 1355. *See also In re Pace*, 456 B.R. 253, 275 (Bankr. W.D. Tex. 2011) ("One lacks the good faith that is essential to the [TUFTA] defense to avoidability if possessed of enough knowledge

of the actual facts to induce a reasonable person to inquire further about the transaction." (quoting *SEC v. Cook*, 2001 WL 256172, at *4 (N.D. Tex. Mar. 8, 2001))).

As a preliminary matter, the Court reiterates that it found Gaucher and Smith's testimony to be credible. Both men believed in good faith they were investing in a legitimate business operation and believed they obtained a valid security interest. However, as described above, the good faith standard is an objective one, Gaucher and Smith's subjective good faith notwithstanding. *See GE Capital*, 654 F.3d at 312–13 (expressly adopting the objective good faith standard in the context of TUFTA and declining to apply a subjective standard). Accordingly, the Court will address what Gaucher, Smith, and Chapman should have known, and whether that information should have put them on inquiry notice that Vendetta Partners was insolvent or otherwise engaged in a fraudulent scheme.

### a.   Case-by-Case Basis

Clovis points out that none of the badges of bad faith listed in *In re IFS Fin. Corp.,* 417 B.R. 419, 445 (Bankr. S.D. Tex. 2009) are present here—specifically, none of Clovis' members were insiders or advisors to the Ponzi scheme. However, the badges listed in *IFS* are not required in every instance to demonstrate lack of good faith. Rather, good faith in the context of a fraudulent transfer is determined on a case-by-case basis. *See Vincentini v. C.I.R.*, 429 F. App'x 560, 566 (6th Cir. 2011) (good faith determination is made on case-by-case basis and takes into account "all pertinent facts and circumstances" (quoting *Mortensen v. Comm'r*, 440 F.3d 375, 387 (6th Cir. 2006))); *In re Fin. Fed. Title & Trust, Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002) (same); *In re Armstrong*, 285 F.3d 1092, 1097 (8th Cir. 2002) (good faith is determined on case-by-case basis). Accordingly, the Court will consider the particular facts and circumstances surrounding Clovis' investment and its purported security interest.

17

b.  Unreasonably High and Speedy Return on Investment

Clovis maintains it reasonably believed the expected return on investment was feasible. As discussed above, high rate of return is often a characteristic of Ponzi schemes.  *In re LLS Am., LLC*, 2013 WL 3305393, at *7.  According to the Investment Memorandum, Clovis expected to receive "between a 2.5x to 3x" return on their investment in Vendetta Partners, "or potentially higher."  (Ex. R-17).  Clovis therefore anticipated up to $5.77 million in profit alone within three months of their initial capital investment. This anticipated profit is inherently unreasonable.  *See In re LLS Am., LLC*, 2013 WL 3305393, at *7 (listing examples of high rate of return: "*Donell v. Kowell*, 533 F.3d at 766 (20 percent return every 90 days); *In re Taubman*, 160 B.R. 964, 972 (Bankr. S.D. Ohio 1993) (typically 15 to 18 percent per annum); *In re Manhattan Inv. Fund, Ltd.*, 397 B.R. at 12 (27.4 to 12.4 percent); and *Scholes v. Lehmann*, 56 F.3d 750, 752 (7th Cir. 1995) (10 to 20 percent per month return);" and concluding that interest rates from 40% to 75% were "too good to be true").

Clovis notes the Receiver admitted in his deposition that Clovis' members believed Helms' representations of the projected profits of investing.  Again, the Court need not "examin[e] a transferee's actual knowledge from a subjective standpoint."  *In re Pace*, 456 B.R. at 275.  Accordingly, Clovis should have known the expected profit from its investment was "too good to be true."  *See In re Am. Hous. Found.*, 2012 WL 4622310, at *14 (Bankr. N.D. Tex. Sept. 30, 2012) (investment with generous returns and no risk were "too good to be true"); *United States v. Frykholm*, 362 F.3d 413, 414 (7th Cir. 2004) (100% return in one month was "transparently too good to be true").

c.   Side Letter Violations of Partnership Agreement

Clovis next argues it acted in good faith and as a prudent investor by collateralizing its investment, as memorialized in the Side Letter.  A side-by-side comparison of the Side Letter and Partnership Agreement reveals the Side Letter violated the Partnership Agreement in several ways.  (Exs. R-13, R-4).

First, the Side Letter explicitly provides, "This Side Letter shall be deemed an amendment to the Partnership Agreement and Subscription Agreement, to the extent provided below."  (Ex. R-13 at 1).  This is in direct contravention of Section 12.2 of the Partnership Agreement, which requires the written consent of the general partner and a majority in interest of the limited partners to amend the Partnership Agreement.  It is undisputed that there was no written consent of a majority in interest of the limited partners for the transfer of the security interest to Clovis.  Second, the Side Letter would automatically transfer ownership of the Ozona Interests, which are partnership property, to Clovis, a limited partner, if a "trigger event" occurs.  This transfer is in clear conflict with Section 5.1 of the Partnership Agreement, which provides that all Vendetta Partners property is "deemed to be owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property."  (Ex. R-4 at 9).

Third, the Side Letter states, "The parties hereby stipulate that the pro rata quarterly royalty distributions that [Clovis] shall have received . . . shall be in lieu of the interest paid upon the Capital Contribution and that no other interest upon the Capital Contribution shall be due."  (Ex. R-13 at 4).  However, the Partnership Agreement explicitly prohibits this agreement in Section 3.5, which states, "No interest shall accrue on any Capital Contributions."  (Ex. R-4 at 6).  Fourth, the Side Letter under a section entitled "Full Recovery of Capital Contribution," the parties anticipate that the sale of the Ozona Interests "shall provide more than adequate funds to

19

return the full Capital Contribution to [Clovis]" and in the event that the sale of the Ozona Interests does not cover Clovis' capital contribution, "Vendetta Partners and its General Partner hereby jointly and severally guaranty full repayment of the Capital Contribution to [Clovis]." (Ex. R-13 at 4).  Contrastingly, Section 7.4 of the Partnership Agreement states a limited partner is not entitled to the return of its capital contribution "except to the extent, if any, that distributions made pursuant to the express terms of [the Partnership Agreement] may be considered as such by law or by unanimous agreement of the Partners," or if the Partnership dissolves.  (Ex. R-4 16–17).  As there was no dissolution or unanimous agreement of the partners, the Side Letter's provision directly violates the terms of the Partnership Agreement.

Clovis argues the Partnership Agreement gives the general partner, Vendetta Management,[7] full authority to guarantee indebtedness, incur obligations, and encumber assets as the general partner deems necessary or advisable for conducting Vendetta Royalty's business activities.  (*Id.* at 6.1(a)).  The Partnership Agreement further states that the limited partners consent to the authority of the general partner without requiring further approval or voting by the limited partners.  Moreover, the Partnership Agreement states that persons dealing with Vendetta Partners have no duty to inquire into the authority of the general partner.  (*Id.* at 6.5(c)).  Clovis therefore argues Chapman was entitled to rely on the authority of Vendetta Management to bind Vendetta Partners.  (*Id.* at 6.5(b), 6.5(c)).

The Partnership Agreement certainly includes the provisions highlighted by Clovis. However, a general partner in a limited partnership owes a fiduciary duty to the partnership and the limited partners.  TEX. BUS. ORG. CODE §§ 153.152(a), 152.204(a).  Under Texas law, a general partner "acting in complete control stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust."  *McBeth v. Carpenter*, 565 F.3d 171,

---

[7] Helms and Kaelin owned and operated Defendant Entity Vendetta Management.

177 (5th Cir. 2009) (quoting *Crenshaw v. Swenson*, 611 S.W.3d 886, 890 (Tex. Civ. App. 1980)).   "It 'is clear that the issue of control has always been the critical fact looked to by the courts in imposing this high level of responsibility.'"   *Id.* (quoting *In re Bennett*, 989 F.2d 779, 789 (5th Cir. 1993)).   Construing the Partnership Agreement as Clovis has, the Vendetta Management would have carte blanche to ignore various provisions of the Partnership Agreement and to encumber Vendetta Partners' assets with little consequence.   The provisions protecting the limited partners' interests above would be completely overridden.   Due to the Side Letter's provisions violating and attempting to amend the Limited Partnership Agreement, the Side Letter is void.   *See Carnie*¸ 2007 WL 1112591, at *12 (illegal contract with Ponzi scheme is void).

Although the Court agrees the Partnership Agreement's provisions may be contradictory, a comparison of the Partnership Agreement and the Side Letter would lead a reasonable transferee to believe that the attempted transfer breached the general partner's high fiduciary duty to the limited partners by placing Clovis ahead of all other limited partners.   At the very least, a comparison would lead a reasonable transferee to conduct an inquiry into the nature of the transfer.   *See Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 19, (S.D. Tex. 2014) (quoting *Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("A transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in good faith.").   Nevertheless, Smith and Gaucher both admitted they did not read the Partnership Agreement, and relied upon Chapman to read it and enter into the Side Letter.   Chapman also spearheaded Clovis' purported due diligence efforts.   As the Court previously noted, Clovis did not conduct meaningful due diligence of

21

Vendetta Partners.   Moreover, neither Chapman nor any other Clovis representative has explained the obvious inconsistencies between the Side Letter and the Partnership Agreement. Because Chapman was a member of Clovis and acted on behalf of Clovis, Chapman's negligence and lack of objective good faith is attributable to Clovis.   The Side Letter therefore does not support Clovis' contention that it acted with objective good faith.

d.   Preferential Treatment of Clovis

Clovis contends that it had no knowledge of whether any other investor collateralized their investment with a security interest, and therefore had no reason to believe the transfer was fraudulent.  (Gaucher Depo. 38:16–22; Chapman Depo. 76:2–11).   However, it is undisputed that Clovis was provided with the Vendetta Partners PPM and the Partnership Agreement at the time Clovis subscribed to the Vendetta Offering, which describe the terms under which Vendetta Partners' limited partners invest.   A reasonable, prudent investor should know preferential treatment of one Class A Limited Partner over other Class A Limited Partners was at least unusual, and would have thoroughly investigated the issue.   *See Byron*, 436 F.3d at 560 (transferee's failure to inquire about company more closely, "in light of abundant suspicious information he possessed . . . raises serious questions about his good faith defense").   Although Clovis contends that other investors sought preferential treatment in the form of differently-structured investments, preferred shares, or right of first return, none of the other Class A Limited Partners sought full repayment of their principal investment through collateralization. Clovis should have known the transfer of the security interest was potentially a fraud upon the other investors.

e. Amegy Credit Facility

Clovis next contends that it in good faith attempted to structure its security interest in a way that would not affect Vendetta Partners' credit facility with Amegy.  In support of this contention, Clovis asserts Chapman in good faith relied on Helms' representation that the Amegy credit facility would not permit an assignment, but would permit a transfer of a security interest in the Clovis Interests.  (*See* Ex. R-10).  Even accepting this assertion as true, a reasonable investor, including one without a background in the mineral royalty field, would independently investigate a potential barrier to collateralizing an investment.  *See In re Nieves*, 648 F.3d 232, 239 (4th Cir. 2011) ("[T]ransferees do not take in good faith if they remain 'wil[l]ful[ly] ignoran[t] in the face of facts which cr[y] out for investigation.'" (quoting *In re Harbour*, 845 F.2d 1254, 1258 (4th Cir. 1988))).  This is especially true where, as here, the investor would have "never invest[ed] without the security interest" (Clovis Brief at 8; Clerk's Dkt. No. 95 Ex. 1-M at 6 (assignment of overriding mineral royalty interests was a material reason behind Clovis' decision to invest)). Clovis should have more thoroughly investigated Vendetta Partners' credit facility with Amegy, which may have prohibited Vendetta Partners from transferring or otherwise encumbering the Ozona Interests.

f. Promotional Expenses/Commission

Clovis does not address the fact that Gaucher and Brock each received promotional expenses far in excess of what is allowed by the PPM.  The maximum amount of promotional expenses permitted to be paid by Vendetta Partners per the terms of the Vendetta Partners PPM was $50,000. Accordingly, Gaucher and Brock's $86,550 commissions for securing the Clovis investment exceeded Vendetta Partners' allowable promotional expenses.  The Court concludes this fact weighs in favor of finding Clovis did not prove objective good faith by a preponderance

of the evidence. *See Mortensen*, 440 F.3d at 387 (court takes into account all pertinent facts and circumstances in good faith determination).

## V.   CONCLUSION

The Court believes Gaucher and Smith had no actual knowledge of fraud and acted with subjective good faith. However, Clovis should have known the transfer of the security interest in the Ozona Interests was fraudulent. During the hearing Smith and Gaucher made it clear that they relied on Chapman's questionable assessments and due diligence. Chapman reviewed the PPM, reviewed the Partnership Agreement, entered into the Side Letter, investigated the Amegy credit facility, and drafted and filed the Notices of Interest without any supervision by Smith or Gaucher. Unfortunately for Smith and Gaucher, Chapman conducted these activities on behalf of Clovis, therefore they are imputed to Clovis. Of course, had the members of Clovis subjectively believed Vendetta Partners was a Ponzi scheme, they would not have invested in it. However, the Court finds there was significant evidence that should have led Clovis to investigate Vendetta Partners and the purported security interest it sought to acquire, and would have led a reasonable investor to believe the transfer was fraudulent.

Considering the above facts in totality, Clovis should have known the collateralization of its investment was a fraudulent transfer. Clovis therefore cannot show by a preponderance of the evidence that it acted with objective good faith, and its affirmative defense under TUFTA fails. Accordingly, the Receiver has shown by a preponderance of the evidence that the transfer was fraudulent, and the transfer of the security interest in the Ozona Interests to Clovis is voidable.

Moreover, because the Court found that the Side Letter is void and unenforceable, Clovis' purported security interest did not attach under the Texas Uniform Commercial Code. *See McGrath v. Bank of West*, 786 S.W.2d 754, 756–57 (three elements must be present for a

24

security interest to attach to collateral: (1) the collateral must be in the possession of the secured party pursuant to agreement; (2) value must have been given for the security interest; and (3) the debtor must have rights in the collateral (citing Tex. Bus. & Com. Code § 9.203(a))).

The Court acknowledges that concluding Clovis does not have a valid security interest in the Ozona Interests will cause Clovis some financial pain.  Unfortunately, "for victims of a Ponzi scheme, everyone is a loser."  *Alguire*, 2013 WL 2451738, at *10 (citing *Kowell*, 533 F.3d at 779 ("Ponzi schemes leave no true winners once the scheme collapses—even the winners were defrauded, because their returns were illusory.")).  Although it may only be a small consolation, as a former Class A Limited Partner of Vendetta Partners, Clovis might be entitled to receive a share of the proceeds from the sale of the Receivership assets—including a portion of the proceeds from the sale of the Ozona Interests.  However, that question is for a later date.

## VI.   Order

Thus, in accordance with the foregoing:

It is hereby **DECLARED** that the transfer of a security interest in the Ozona Interests from Vendetta Royalty Partners, LTD. to Clovis Capital Ventures, LLC is voidable as a fraudulent transfer under TUFTA, and the Ozona Interests (as fully defined in Clerk's Dkt. No. 110) are properly held in the Receivership Estate.

It is further **DECLARED** that any liens, claims, encumbrances and/or interests of security asserted in the Ozona Interests under any legal or equitable principles are not valid, have been paid, or have been otherwise discharged.

It is further **DECLARED** that any guaranty of payment by Vendetta Royalty Partners, LTD., Vendetta Royalty Management, LLC or any other entity placed in receivership by order of this Court (*see* Clerk's Dkt. Nos. 11, 76) are void and invalid.

In accordance with the above findings and conclusions, the Court hereby **GRANTS** Receiver's Motion for Entry of an Order (1) Rejecting Secured Claim of Clovis Capital Ventures, LLC, and (2) Authorizing Sale of Certain Royalty Interests Free and Clear of All Liens, Claims, and Encumbrances (Clerk's Dkt. No. 95).

For the same reasons, the Court further **GRANTS** Receiver's Motion for Entry of Order Confirming Sale of Certain Oil and Gas Interests of Receivership Estate and Receiver's Motion to Expedite Treatment of Previously Filed Motions (Clerk's Dkt. No. 110).  The Receiver is directed to take all further action necessary to complete the sale and transfer of the Ozona Interests to the Buyer pursuant to the Sales Order.

All other relief requested in the motions and not expressly granted herein is denied.

All findings of fact that are more appropriately considered conclusions of law are to be so deemed.  Any conclusion of law more appropriately considered a finding of fact, shall be so deemed.

**SIGNED** on March, 10 2015.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE