**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| ROBERT A. HELMS, ET AL., | § | A-13-CV-01036 ML |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| WILLIAM L. BARLOW and GLOBAL | § | |
| CAPITAL VENTURES, LLC, | § | |
| Relief Defendants, solely for | § | |
| the purpose of equitable relief. | § | |

**MEMORANDUM OPINION AND ORDER
ON MOTION FOR SUMMARY JUDGMENT**

Before the Court are Plaintiff's Motion for Summary Judgment against Robert Helms and

Janniece Kaelin, filed June 30, 2015 (Clerk's Dkt. No. 258); Plaintiff's Motion for Sanctions against

Defendant Janniece Kaelin, filed July 13, 2015 (Clerk's Dkt. No. 264); and Plaintiff's Motion for

Summary Judgment against Defendants Deven Sellers and Roland Barrera, filed June 30, 2015

(Clerk's Dkt. No. 260).  The parties consented to this Court's jurisdiction, and the case was assigned

to this Court's docket for all purposes on September 29, 2014.  (Clerk's Dkt. No. 118).  Having

considered the parties' arguments at the hearing, the briefing, and the applicable case law, the Court

**GRANTS** the SEC's Motions (Clerk's Dkt. Nos. 258, 264) for the reasons set forth below.

**I.    PROCEDURAL BACKGROUND**

On December 3, 2013, the Securities and Exchange Commission ("SEC") filed an action

against Robert A. Helms ("Helms"), Janniece S. Kaelin ("Kaelin"), Deven Sellers ("Sellers"), Roland

Barrera ("Barrera"), and a number of entities ("Defendant Entities") (collectively, "Defendants").

The complaint alleged Defendants were engaged in securities fraud and sought appointment of a receiver. That same day, the Court entered a Temporary Restraining Order restraining and enjoining Defendants from further violations of the Anti-Fraud and Broker-Dealer registration provisions of federal securities laws. (Clerk's Dkt. No. 10). The Court also entered an order appointing Thomas L. Taylor III ("Receiver") as Receiver for Defendants. (Clerk's Dkt. No. 11). The appointment order granted the Receiver authority to marshal and preserve Defendants' assets for the benefit of the Receivership Estate.  The SEC now moves for summary judgment against Helms and Kaelin, contending they violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Securities Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder, by engaging in a fraudulent Ponzi scheme and misrepresenting material facts to investors.  The SEC also moves for summary judgment against Sellers and Barrera contending they violated Section 15(a) of the Exchange Act, Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder by soliciting investors and negotiating the sale of limited-partnership securities without the required license and making various misrepresentations of material facts.

## II.    SUMMARY JUDGMENT EVIDENCE

As a preliminary matter, Defendants Helms and Kaelin have failed to respond to the motion for summary judgment or otherwise provide evidence rebutting or controverting the SEC's evidence. Defendants Sellers and Barrera have also failed to respond to the motion for summary judgment against them.  Accordingly, the Court hereby accepts as true the evidence proffered in support of each motion for summary judgment.[1]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (after

---

[1]  Of course, Defendants' failure to respond to the motion for summary judgment does not permit the Court to enter a "default" summary judgment in favor of the SEC.  *Eversley v. MBank Dall.*, 843 F.2d 172, 174 (5th Cir. 1988).

defendant offers evidence establishing there is no genuine disputed of material fact, burden shifts to plaintiff to direct Court's attention to evidence in record sufficient to establish genuine dispute of material fact exists for trial); *Tillison v. Trinity Valley Elec. Coop.*, 2005 WL 292423, at *1 (N.D. Tex. Feb. 7, 2005) (citing *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996)) (court may accept non-rebutted evidence as true for summary judgment purposes). The evidence the SEC submits is as follows:

## A.    Background

Defendants Helms and Kaelin operated and controlled Vendetta Royalty Partners ("Vendetta Partners") and several other Defendant Entities, including Iron Rock Royalty Partners ("Iron Rock").[2] Vendetta Partners was organized and marketed as a standard limited partnership that would hold and distribute royalty interests from approximately 2,000 oil and gas wells located principally in Texas ("Vendetta Portfolio"). Vendetta Partners began soliciting investors in at least July 2011. Iron Rock was a limited partnership offering Helms and Kaelin launched after forming Vendetta Partners which purportedly sought to raise $300 million in less than a year for the purpose of investing in oil and gas properties.

## B.    Ponzi Scheme Evidence

Helms and Kaelin raised approximately $31,422,861.00 by selling limited-partnership interests issued by Vendetta Partners and Iron Rock to as many as 129 investors. APP0002. As detailed below, Helms and Kaelin represented to investors that Vendetta Partners generated profits from a portfolio of oil-and-gas royalty interests. Those profits were then distributed to investors as "royalty distributions." However, Vendetta Partners' royalty revenues alone, even disregarding the

---

[2] Helms admits that he and Kaelin alone controlled and directed the activities of Vendetta and Iron Rock. APP0059 (Helms at 85:1–13; 141:24–142:7); (*see also* Clerk's Dkt. No. 5 at APP000109 (organizational chart)).

profits remaining after expenses were paid from those revenues, fell short of covering the royalty distributions.  APP0003.

Because the royalty revenues were insufficient to pay the royalty distributions, Helms and Kaelin paid the distributions using later investors' money.[3]  These distributions began at least as early as August 2011 and continued until the very last investment in mid-2013.  By way of example, Vendetta Partners made the following distributions during this period: (i) $187,836.00 on August 17, 2011; (ii) $650,000.00 on January 25, 2012; (iii) $222,000.00 on November 30–December 1, 2012; and (iv) $255,841.00 on December 6–8, 2012. (Clerk's Dkt. No. 5-22 (Hahn Declaration) at 8–9; Clerk's Dkt. No. 186-1 (Cheek Declaration) at 8–11.  In each instance, Vendetta used investor funds to make the investor distributions.  *Id.* Helms and Kaelin similarly used the very last investment—a $500,000.00 investment into Iron Rock in mid-2013 by investor Ralph Parks ("Parks")—to make a distribution to investors.  APP0106–07 (Helms at 275:6–277:9).  Helms testified that he and Kaelin used $100,000.00 of the investment to buy out a Vendetta Partners investor. *Id.*

Danielle Supkis Cheek ("Cheek"), the forensic accountant retained by the court-appointed Receiver in this matter, testified that in her professional opinion, Vendetta Partners and its affiliated entities operated as a Ponzi scheme.[4]  Of the $31,422,861.00 raised from investors, Helms and Kaelin made distributions using new investor funds totaling at least $4,767,541.00.[5]   APP0003.

---

[3] Helms in particular, as the General Partner, was responsible for calculating and distributing the distributions for Vendetta Partners.  (Helms at 81:1–13); *see also, generally* APP0814–832 (Helms's handwritten notes reflecting profit and loss calculations and notes on distributions).

[4] The declaration of Carol J. Hahn, staff accountant with the SEC, also supports this finding.  (Clerk's Dkt. No. 5-22).

[5] This is the deficit of cumulative net royalty income versus investor distributions paid ($3,925,295.00 minus $8,692,836.00). This number certainly understates the amount of Ponzi payments since it ignores other expenses paid out of royalty income. Cheek also confirmed that there were no other significant sources of cash other than royalty

Cheek further testified that from mid-2011 until the last distribution was made in late 2013, every investor distribution was a "Ponzi payment" because from mid-2011 forward investor outflows exceeded cumulative royalty income.  APP0005 (Fig. 2).

### C.   Furtherance of Ponzi Scheme Evidence

#### 1.   Misappropriation

Helms and Kaelin represented to investors in the Vendetta Partners Private Placement Memorandum ("PPM"), which they controlled and distributed, that any funds raised would be used as follows:

|  | Application of Maximum Proceeds | Percent of Subscriptions |
|---|---|---|
| Purchase Costs of Royalty Interests | $49,570,500.00 | 99.14% |
| Loan Repayment | $379,500.00 | .76% |
| Promotional Expenses | $50,000.00 | .10% |

(Clerk's Dkt. No. 5-11 (Moore Declaration) at 4; Clerk's Dkt. No. Dkt. 5-12 (7/28/12 email attaching PPM) at 1; Clerk's Dkt. No. 5-13 (Vendetta Partners PPM and addendum, signed by Helms and Kaelin) at 17, 32).  Investor funds were not spent this way.  Instead, as detailed below, Helms and Kaelin spent millions on other items, including: (i) Helms and Kaelin's personal spending, including spending on their families, friends, and associates; (ii) business expenses; and (iii) royalty distributions.[6]

#### a.   Misappropriation for Personal Use

Helms and Kaelin misappropriated at least $8,442,116 for spending on themselves and their

---

revenues and investors' money.  APP0003.

[6] As noted above, Helms and Kaelin alone controlled the Vendetta entities. Helms admits that he, as managing partner, oversaw expenditures. APP0076 (Helms at 154:18-22).

5

families, friends, and associates.  APP0013. Their personal spending included: (i) $247,415.00 for Kaelin's daughter's wedding in Hawaii; (ii) $111,600.00 for airfare, including for the wedding; (iii) $102,440.00 for tuition; and (iv) $287,928.00 for mortgage payments.  APP0015.

Helms and Kaelin also used investor funds to take a 23-day trip around the world during March and April 2012.  As Helms noted in an email to his daughter, this "Journey of Man" included over 50 hours of flight time on a private jet. APP0319-331.  According to Helms, he and Kaelin relaxed on the beach in Fiji; swam with dolphins in Hawaii; met elephants in Thailand, while staying at a Four Seasons overlooking an elephant reserve; attended a fireworks display at the Rajah's palace in India; spotted elephants in Tanzania; and rode camels in Jordan. *Id.* The trip cost at least $137,460.00.  APP0332; APP0015.  Helms paid for the trip with the proceeds from a single $200,000.00 investment.[7]  APP0016.

### b.    Misappropriation for Business Expenses

As noted in the PPM chart above, investment proceeds could only be used for two kinds of business expenses: loan payments and promotional expenses. Consistent with this, Helms and Kaelin represented to investors that business expenses would be paid using royalty-interest revenues: "Every dollar that comes in goes out in acquisitions. So if you put $1 million into the company, that $1 million is spent on acquisitions. Revemue [sic] then comes in and the bills are paid." APP0333; *see also* Dkt. 5-11 (Moore Declaration) at 3-4; Dkt. 5-16 (Morally Declaration) at 3-4.[8]

However, Vendetta Partners revenue was grossly insufficient to cover its expenses, largely

---

[7] The balance of this investment was also misappropriated—primarily for a $61,250 payment to a rehabilitation center. APP0015.

[8] Further, as Cheek noted in her testimony at the Court's February hearing, "Now, usually investor distributions are used as a return on the investment to the investors, and are funded out of the accumulation of net income." 2/12/15 Hearing Tr. at 31:14-16. Thus, this statement from Helms and Kaelin is consistent with the expectations of a reasonable investor about the source of funds for both business expenses and distributions—which is no doubt why it was made.

because Helms and Kaelin were spending significant amounts of investor funds on themselves.  The total amount of investor funds misappropriated to cover business expenses was at least $12,851,455.00.[9]  APP0013.   These funds were misappropriated for items including: (i) $2,343,037.00 for payroll, contract labor, taxes, and benefits; (ii) $3,295,931.00 for professional services; (iii) $172,430.00 for telecom, internet, and IT; and (iv) $161,901.00 for rent, utilities, and maintenance. APP0014.

### 2.   *Misrepresentation in Furtherance of Ponzi Scheme*

#### a.   Misrepresentations about Use of Investor Funds

Helms and Kaelin represented in the PPM chart and other communications that more than 99% of investor funds would be used to buy royalty interests.  However, at most, 32% of investment proceeds were used to purchase mineral interests.[10]  APP0002, 0013.

Similarly, Helms and Kaelin overspent on loan payments. They made at least $1,100,000.00 in loan payments to Amegy Bank ("Amegy")—almost three times the amount disclosed to investors. (Clerk's Dkt. No. 5-22 (Hahn Declaration) at 5). They paid these excess amounts in an effort to cure delinquency and covenant violations in the loan agreement with Amegy.  (Clerk's Dkt. No. 232-2 (February 2012 email correspondence with Amegy) at 16-17); APP0825–826. Helms and Kaelin knew about the loan delinquency, the covenant violations, and Amegy payment amounts. *Id.* But they did not disclose these important facts to investors in the PPM or otherwise.  (Clerk's Dkt. No. 5-13 (Vendetta Partners PPM); Clerk's Dkt. No. 5-11 (Moore Declaration) at 5-6; Clerk's Dkt. No.

---

[9] This amount is calculated as: [$8,824,624: Business Expenses] + [$1,838,370: Commissions & Investor Recruiting] + [$2,617,961: Amegy & Other Loan] – [$50,000: Disclosed Promotional Payments] – [$379,500: Disclosed Amegy Loan Payments].

[10] This percentage, calculated as [$9,922,370: Potential Royalty Interest Purchases] % [$31,422,861: Investor Proceeds], is certainly overstated since fixed asset purchases are overstated in Vendetta Partners' books and records. APP0012.

5-16 (Morally Declaration) at 5-6).

>   b.   Misrepresentations about Professional Backgrounds and Performance
>         of Prior Investment Portfolios

Helms and Kaelin represented to investors that they had extensive experience in royalty-interest acquisitions and that they had successfully managed multiple portfolios.  Helms's PPM bio stated that he had "worked with various mineral companies over the last 10 years advising management on issues involving the acquisition and management of royalty interests, mineral properties and related legal and financial issues." (Clerk's Dkt. No. 5-13 (Vendetta Partners PPM) at 21). In reality, as Helms admitted in his deposition, his only meaningful experience in this area consisted of work for Vendetta Partners and its related entities.  APP0043–45 (Helms at 23:10–32:6). He had no prior experience with any mineral company, much less "multiple mineral companies." *Id.* And the experience that he did have was focused on tax and estate planning work—not the acquisition and management of royalty interests. *Id.*

Kaelin also greatly overstated her experience. She distributed Vendetta Partners marketing materials, directly and through a commissioned sales force, stating:

> In the early Nineties, after an extremely successful history in the offshore oil and gas industry Jeff Sanderfer [sic] set up and [sic] energy fund ($500M). Approximately 15 years ago, Janniece Kaelin was hired to run and manage royalty mineral rights for his fund. [. . .] Sanderfer [sic] provided his "rolodex of wealthy industry and business contacts" and proprietary software (worth millions in development) to Kaelin and gave her the opportunity to do this on her on [sic]. Utilizing their years of experience and the wealth of contacts provided them, Kaelin and her team of experts then formed Vendetta Royalty Partners, Ltd.

APP340–53.

Kaelin never managed acquisitions for Sandefer's fund or worked closely with him.

APP0180–81, 189 (Foti at 120:8–121:16; 154:20–155:17).[11]  Sandefer's fund was not worth $500 million, and he did not give Kaelin his "rolodex of wealthy industry contacts." *Id.* Nor did he give her proprietary software worth millions in development.  *Id.*  Rather, Kaelin's role was limited to cold calling land owners and attempting to get them to sell their mineral interests, with separate approval required before any sale was finalized.  APP0155, 157 (Foti at 19:13–20:13; 25:3–26:20).

Upon discovering that Vendetta Partners was using this language to promote its investments, Sandefer confronted Kaelin.  He told her the description was "highly misleading." APP354–57. Sandefer also rebuked, "You were not hired to manage royalty mineral rights nor did I provide you a 'rolodex' or proprietary software."  *Id.*  Kaelin responded, "I have no idea where this has come from. I have never, at any time said that I managed anything for you. This is not in anything that we have ever said, written or communicated to any investor." *Id.*  However, Kaelin personally emailed the language to investors and provided it to her sales force to use in soliciting investors. APP340–53.

Finally, Kaelin and Helms misrepresented their success in managing other investment funds. Vendetta Management marketing documents claimed that its principals—Helms and Kaelin—had invested over $300 million since 2003. APP0362. They also claimed to have managed seven investment partnerships and achieved "consistent" and "significant" returns.  *Id.*  However, Helms and Kaelin had neither invested $300 million nor managed seven partnerships, much less produced the claimed returns in those partnerships. APP0186 (Foti 143:4–144:10).

         c.    Misrepresentation about Litigation

Both the Vendetta Partners and Iron Rock PPMs[12] falsely stated, "There are no material

---

[11] Raquel Foti worked with Kaelin for many years, starting at Sandefer's fund, where Foti ran financial models valuing oil and gas properties, and continuing through her time at Vendetta Partners. APP0154–58, 175–76 (Foti at 14:9–29:16;100:5–104:3).

[12] The Iron Rock PPM was written by Helms and Kaelin. APP371–461.

pending legal proceedings against the Partnership, the General Partner or its Affiliates." (Clerk's Dkt. No. 5-13 (Vendetta Partners PPM) at 30); APP0407; APP0228 (Parks at 53:20-54:13).  In truth, Vendetta Partners, Vendetta Management, Helms, Kaelin, and other entities affiliated with them were engaged in litigation.  A private party sued Helms and Kaelin in December 2011, alleging that they committed fraud by purporting to sell mineral interests that they did not own in exchange for $1.2 million.[13]  (*See generally* Clerk's Dkt. No. 5-5 (docket report), Clerk's Dkt. No. 5-6 (state court petition), and Clerk's Dkt. No. 5-7 (second amended petition)).  The Illinois Environmental Protection Agency initiated action against Haley Oil—an entity owned 50/50 by Helms and Kaelin—in May 2012, alleging illegal "release incidents." APP0069 (Helms at 126:16-19); (*see generally* Clerk's Dkt. No. 5-8 (violation notice) and Clerk's Dkt. No. 5-9 (compliance commitment agreement)).  And the IRS initiated action against Kaelin in October 2012 relating to a tax liability. (*See generally* Clerk's Dkt. No. 5-10 (petition to enforce IRS summons)).[14]

### D.    Cover Up Evidence

#### 1.    *Fabricated Audit Letter*

Helms and Kaelin used an audit letter purportedly written by Haas Petroleum Engineering Services, Inc. ("Haas") to give investors the impression that the Vendetta Partners portfolio had an audited value of over $26 million. APP0462, 506, 556, 645, 646-650.[15] The letter, dated January 17,

---

[13] Parks testified that he would have "stopped cold" if he had known about this litigation when deciding whether to invest in Iron Rock Partners. APP0237–38 (Parks at 92:17-93:3).

[14] As the documents cited in this paragraph show, Helms and Kaelin knew about these proceedings and actively participated in them. *See also* APP0817, 821, 828, 832. Helms's own notes also show that he was aware that this representation was false. APP818 ("No litigation pending" (-2 lawsuits now)") (emphasis in original).

[15] Aside from distributing the fake audit letter, Helms also lied to potential investors about these audits. He told one investor that "audits have occurred at least once year [sic], and often once per quarter. Since new partners share in the existing portfolio, Raquel's engineering for the effective date(s) of the new partners is always audited by outside firms. We currently use Haas Petroleum in Dallas, Tx [sic] and the management team has used them since the beginning 2007 [sic] for auditing." APP0651. As Helms knew, Vendetta Partners was not currently using Haas, and Haas never

2011, stated that as of December 30, 2010 Vendetta Partners owned over 18,000 properties worth over $26,189,000, "which compares closely with Ms. Foti's value of [. . .] $26,379 [million]." *Id.*

Robert Haas ("Haas"), the purported author, testified he did not do any work for Vendetta Partners during this time period. APP0268-279 (Haas at 28:7–33:13). In his records, Haas has no supporting documentation for the audit letter. *Id.* Haas neither invoiced Vendetta Partners nor received any payments during this period. *Id.* The last work that Haas did for any entity related to Vendetta was an audit letter for the Robro Royalty Partners portfolio, dated August 14, 2009. APP0270 (Haas at 34:4–35:7); APP0173 (Foti at 89:23–90:2). This was one of only two audits that Haas did for Robro. APP0173 (Foti at 90:14–21).

In fact, it would have been impossible for Haas to have performed the audit as claimed in the letter. Foti's year-end valuation was not complete until months into the year. APP0173 (Foti at 90:2–96:8); APP0656–57. Therefore, there is no way that the audit could have been completed by January 17, 2011, as claimed in the letter. There was nothing to audit at that time. Moreover, based on Haas's two prior engagements by Helms and Kaelin, the audit did not begin and the audit letters were not issued until much later in the year (October 10, 2008 and August 14, 2009). *Id.*; APP0658–661.

### 2.    *Round-Trip Transactions as Royalty Revenue*

Helms and Kaelin orchestrated what are called "round-trip transactions." For example, on November 17, 2011, Vendetta Partners transferred $2,208,800.00 to Relief Defendant William Barlow ("Barlow"). (Clerk's Dkt. No. 5-22 (Hahn Declaration) at 6-7; Clerk's Dkt. No. 186-1 (Cheek Declaration) at 8). The next day, Barlow transferred $2,200,300.00 to Haley Oil. *Id.*

---

did a quarterly audit. APP0185–86 (Foti at 140:15–141:9).

Between December 1 and February 1, 2011, Helms returned $1,955,000.00 million from Haley Oil to Vendetta Partners and recorded it as either royalty income or lease bonus income in Vendetta Partners' accounting system. *Id.* This had the effect of creating fictitious income to support "partnership income" distributions—which were actually funded by later partners' investments. It had the added effect of making Vendetta Partners seem more profitable to actual or potential investors. APP0664–65.

There was no legitimate business purpose for these transactions. Barlow was a neighborhood friend of Helms and Kaelin. APP0283–85 (Barlow at 19:17–25:15). He testified that he had no oil-and-gas experience, never owned any mineral interests, and never engaged in any mineral-related transactions with Vendetta Partners. *Id.* at APP0285, 287–88 (Barlow at 26:16-27:7; 35:23-37:10). Helms and Kaelin orchestrated these transactions solely to cover up their scheme.

Helms and Kaelin falsified documents in order to make the round-trip transactions seem legitimate. In 2011, Kaelin asked Barlow to come to Vendetta Partners' office to execute a series of documents. APP0287–94 (Barlow at 33:22-62:15); APP0669-715. The documents were prepared by Helms, and signature pages were brought into Kaelin's office for Barlow to sign. *Id.* Barlow was told that he was signing releases for funds that had been transferred to his account. *Id.* In reality, he was being asked to sign signature pages for deeds to certain properties, including properties located in Ohio. *Id.* However, Barlow did not own any of these properties. *Id.* Rather, these properties were owned by Helms and Kaelin through Technicolor Minerals, another entity they controlled. APP0053 (Helms at 61:2–13); APP0795; APP0674. These properties had been purchased by Technicolor about two years earlier for only $70,000.00. APP0747.

Helms and Kaelin also falsified purchaser letters accompanying these deeds. For example, a November 15, 2011 letter purporting to be from Barlow to Kaelin was signed "Willie." APP0673.

However, prior to his SEC deposition Barlow had never seen the document. APP0287 (Barlow at 34:6-12). Nor has he ever signed a letter "Willie" in his life. *Id.*[16]

### E.    Sellers and Barrera

Sellers is Kaelin's cousin.   In 2012, Sellers worked for Helms and Kaelin at Vendetta Partners selling securities.  SBAPP 7, 13, 15, 74 (Sellers at 23:24–25, 48:8–22, 53:19–20) (Barrera at 31:3–12).   In mid-2012, Sellers invited Barrera to join him in selling Vendetta securities and the securities of several other Defendant Entities.  SBAPP 20, 23, 74–75, 78, 83 (Sellers at 73:6–21, 88) (Barrera at 31:13–35:5; 45:24–46:18; 67:13).   Sellers and Barrera agreed to split any commissions earned on investments brought in by Barrera.   SBAPP 20, 31, 78 (Sellers at 73:6–21, 119:2–6) (Barrera at 47:16–48:2).

#### 1.    *Solicitation and Negotiation Evidence*

Based on Sellers's description of the Vendetta investment, Barrera thought that his friend Jamie Moore might be interested. SBAPP 20, 74–75, 78 (Sellers at 73:1–19) (Barrera at 31:13–35:5; 45:24–46:18). Moore represented an investment company, Lacova Capital LLC ("Lacova"), which he operated with his partner John Morally.  (Clerk's Dkt. No. 5-11 at 1 (Moore Declaration)).

Barrera contacted Moore and explained the opportunity to invest in Vendetta. He then arranged for Moore to personally meet with Sellers and Barrera to learn more about the investment. SBAPP 20, 79 (Sellers at 73:1–21) (Barrera at 50:19–51:17).  On July 27, 2012, Barrera, Sellers, and Moore met at a restaurant in Costa Mesa, California.  SBAPP 19, 21, 79 (Sellers at 72:17, 77:3–5, 142:2–7) (Barrera at 51:16–17).  Barrera testified that the "only reason" he set up the meeting was that he stood to make money if Lacova invested in Vendetta. SBAPP 82 (Barrera at 64:6–15).

During the meeting, Sellers and Barrera offered to sell Lacova Vendetta securities. Sellers

---

[16] Helms was responsible for approving the filing of the falsified deeds. APP0810–11.

described Vendetta as an oil fund. SBAPP 79 (Barrera at 52:5–23). Sellers told Moore that Vendetta "had an opening of 3 million available to sell," that Lacova would likely receive "two or three times" its investment in returns, and that the Lacova investment would buy out the interest of an existing investor. *Id.*; SBAPP 20 (Sellers at 73:22–74:1; 76:17–24). After the meeting, Sellers emailed Moore, copying Barrera and attaching the Vendetta Partners PPM containing a detailed description of the securities offering. (Clerk's Dkt. No. 5-11 at 2 (Moore Declaration); Clerk's Dkt. No. 5-12 (7/28/12 email attaching PPM); SBAPP 21, 85–86 (Sellers at 78:5–10) (Barrera at 73:3–77:25)).

Sellers and Barrera remained in contact with Moore to help negotiate the Lacova investment after the initial meeting. Barrera spoke with Moore about the deal multiple times, determining the issues that needed to be resolved before Lacova would invest and passing them along to Sellers. SBAPP 88 (Barrera at 85:7–87:19), 105. Barrera's continuing contact with Moore facilitated discussions between Lacova and Vendetta while they negotiated an addendum to the Vendetta subscription agreement prior to any investment. (Clerk's Dkt. No. 5-13 at 31–32).

Sellers continued to email Moore after the initial meeting, seeking to induce the investment. For example, Sellers wrote, "I spoke with [Barrera] last night and he talked with me a little about the things you need to help you make this decision. [. . .] We look forward to bringing you into the [Vendetta Partners] family." SBAPP 105. Sellers also participated in behind-the-scenes communications with Vendetta concerning the Lacova negotiations, saying that he could smooth over certain concerns Moore had about the investment. SBAPP 106, 111. He was copied on email discussions between Lacova and Vendetta regarding the PPM, and he tried to facilitate the negotiations where he could. SBAPP 26 (Sellers at 99:8–10). And he relayed information from Vendetta to Moore regarding the reasons the existing investor wanted to sell. SBAPP 24 (Sellers at 91:16–92:15).

14

Lacova invested $3,050,000.00 in Vendetta over August 13–14, 2012. (Clerk's Dkt.No. 5-13 at 31 (Vendetta PPM and addendum)); SBAPP 116.  In return, on August 14, 2012, Vendetta paid Sellers $212,500.00 and on August 20, 2012, paid Barrera $211,000.00 for the Lacova investment. Vendetta booked these payments in its general ledger as promotional expenses, specifically "Promotion on 3,050,000.00 partner investment" and "Promotion on 3mil Investment," respectively. SBAPP 118.

### 2.    *Commission Misrepresentation Evidence*

During the initial meeting on July 27, 2012, Sellers told Moore that Sellers and Barrera would receive a "small" payment for securing the investment.  SBAPP 24 (Sellers at 90:5–91:15); (Clerk's Dkt. No. 5-11 at 2 (Moore Declaration)).  Barrera admittedly did not dispute Sellers's characterization that it would be "small."  *Id.*; SBAPP 82 (Barrera at 63:18–64:15).  Barrera further admitted that when Moore asked him after the meeting whether Barrera "was going to get anything" in connection with a Lacova investment, Barrera considered the subject "none of his business." SBAPP 83 (Barrera at 65:2–4).  Barrera simply said Sellers "was going to take care of me."  SBAPP 83 (Barrera at 66:5–11).  He did not fully explain to Moore that Barrera and Sellers would split the commission.  *Id.*

As mentioned above, Sellers emailed Moore the PPM the day after the lunch, copying Barrera.  Sellers admitted that he read the PPM before he emailed it to Moore. SBAPP 26 (Sellers at 100:2–7).  Barrera claimed he did not read it.  SBAPP 85 (Barrera at 76:18–77:2).  The PPM contained a stand-alone page with a bold-print heading, stating "Application of Proceeds." (Clerk's Dkt. No. 5-13 (Vendetta PPM) at 17).  This section stated that Vendetta would use no more than $50,000.00 of the entire $50,000,000.00 offering proceeds for "Promotional Expenses."  *Id.*  It further stated that all other proceeds would be used to purchase royalty interests and to repay loans.

*Id.* However, the combined commissions totaled $423,500.00.

Sellers testified that he had no basis for making the statement that his compensation would be small. SBAPP 24 (Sellers at 91:4–15). He testified that he knew he would receive compensation but was unsure of the amount. SBAPP 24 (Sellers at 90:5–9). And he testified that Kaelin told him, after he received the payment, that Vendetta had already paid the existing investor $500,000.00 before receiving the Lacova investment. SBAPP 26 (Sellers 95:22–98-13). He further testified that Kaelin told him Vendetta was able to pay $423,500.00 of Lacova's investment to Sellers and Barrera, and the balance of the $500,000 to another Vendetta employee, because Vendetta had previously paid $500,000 to the existing investor. *Id.*

Barrera testified that he that he believed he would receive from 2% to 3% of the amount invested. SBAPP 78 (Barrera at 48:3–8). In other words, Barrera believed that he and Sellers would split an amount ranging from $122,000.00 to $183,000.00 based on the value of Lacova's proposed $3,050,000 investment. Barrera believed, therefore, that he personally stood to receive far more than the $50,000 PPM limit and that Sellers would receive a similar amount. Yet he made no effort to dispute Sellers's representation at the lunch that the total amount would be small. Nor did he truthfully state to Moore the amount he believed he stood to receive upon direct questioning from Moore. He thus allowed Moore to continue to believe the expected shared commission was simply "small," specifically $50,000 or less.

### 3.   *Offer of Securities Issued by Other Companies Evidence*

Roland and Barrera also offered to sell investors limited-partnership interests in Vesta Royalty Partners ("Vesta"), a company affiliated with Vendetta Partners. (Clerk's Dkt. No. 5-15 (7/29/12 email attaching Vesta solicitation) at 1–21); SBAPP 30, 86 (Sellers at 11:20–25) (Barrera at 78:19–79:6). Two days after the initial meeting with Moore, Sellers emailed him, copying Barrera

and attaching an offer to sell Vesta securities.  *Id.*  In addition, Sellers offered to sell John Morally ("Morally"), Moore's business partner, securities issued by Iron Rock.  SBAPP 19 (Sellers at 69:4–18)); (Clerk's Dkt. No. 5-16 at 7 (Morally Declaration); Clerk's Dkt. No. 5-20 (3/1/13 email attaching Iron Rock solicitation)).  As detailed above, each also admittedly knew that he would receive compensation for successfully closing investments in these offerings.  Neither Sellers nor Barrera has ever registered as a broker or become associated with a registered broker.  SBAPP 45 (Sellers at 173:10–22); (Clerk's Dkt. 5-1 (Davis Declaration) at 4).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).  The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact."  *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 323).  The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Celotex*, 477 U.S. at 323; *Celtic Marine Corp. v. James C. Justice Co., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent

17

evidence. *Celtic Marine*, 760 F.3d at 481 (citing *Celotex*, 477 U.S. at 325). Once the non-movant has been given the opportunity to present evidence to create a genuine issue of fact, the court will grant summary judgment if no reasonable juror could find for the non-movant. *Boos v. AT&T, Inc.*, 643 F.3d 127, 130 (5th Cir. 2011).

## IV.   ANALYSIS

### A.   Motion for Sanctions

As a preliminary matter, SEC filed a motion for sanctions against Kaelin that, if granted, would have a substantial effect on this case. Specifically, due to Kaelin's repeated refusal to comply with her discovery obligations, SEC argues the Court should strike her pleadings, enter default judgment against her, and draw an adverse inference against her in this matter. Kaelin did not respond to the motion.

#### 1.   Background

As the SEC points out, Kaelin's history of evasive and manipulative conduct to avoid her discovery obligations is well documented in the record. Kaelin's failure to participate in discovery and comply with court orders are as follows:

(1) Kaelin did not appear for her deposition by the Court-appointed Receiver in this matter on June 30, 2014, claiming to be in the hospital;

(2) Kaelin did not appear for her deposition by the SEC on April 9, 2014, again claiming to be in the hospital;

(3) Kaelin did not appear for her deposition by the SEC on May 21, 2015, claiming an incapacitating illness prevents her from being deposed (Clerk's Dkt. No. 219);

(4) Kaelin did not appear for a hearing relating to her discovery obligations on June 4, 2015 and failed to comply with a court order to submit medical documentation in support of her incapacity claims (Clerk's Dkt. No. 242);

(5) Kaelin appeared for her court-ordered deposition on June 30, 2015, but failed to

meaningfully participate in the deposition[17]  (Clerk's Dkt No. 264; Ex. 4 at 1–14 "6-30 Tr.");

(6) Kaelin appeared for her court-ordered deposition on July 1, 2015, but failed to meaningfully participate and left soon after arriving, claiming she needed to go to the emergency room.[18]  (Clerk's Dkt No. 264; Ex. 4 at 14–60 " 7-1 Tr.")

The Court has found on several occasions that the SEC had met its burden to show Kaelin has engaged in a pattern and practice of evasive and manipulative behaviors to avoid her discovery responsibilities in this litigation.  (Clerk's Dkt. Nos. 246, 255, 256).  The Court has also found Kaelin failed to meet her burden to show she was incompetent and therefore unable to be deposed.[19] (Clerk's Dkt. Nos. 245, 246, 255, 256).  (*See* Clerk's Dkt. No. 264 Ex. 2 "6-22 Tr." (transcript of July 22, 2015 hearing)).  In fact, Kaelin's medical records and courtroom demeanor establish she is competent to testify.  (Clerk's Dkt. No. 255 at 5).  During each hearing and within each discovery order, the Court admonished Kaelin of the possible consequences of noncompliance with its orders,

---

[17] During an emergency hearing on Kaelin's lack of participation in the deposition, counsel for the SEC explained that Kaelin took repeated bathroom breaks claiming she had diarrhea, placed her head on the table  where it remained for much of the deposition, informed the SEC that she was heavily sedated, had slurred speech, was unresponsive to questioning, and often would groan instead of answering "yes" or "no" questions. The Court again found Kaelin had not presented evidence that she was incompetent to testify. In fact, the Court noted in an order relating to the emergency hearing:

> Kaelin's demeanor in the courtroom is, as the SEC characterized it, "dramatically and diametrically opposite" from the demeanor the SEC described during her deposition.  Kaelin was again able to respond to the Court's questions with relevant, clear answers.  She appeared alert and engaged. Further, she was able to cogently argue that she is ill and the deposition should be stayed until her next medical appointment is completed, the date and nature of which is unclear.  Physically, Kaelin was sitting upright and unsupported, maintained eye contact with the Court, and spoke swiftly without slurring.

(Clerk's Dkt. No. 256 at 3). The Court cancelled the deposition and rescheduled it for the following morning.

[18] Kaelin again claimed she was incapable of testifying because she was sedated, in pain, and had diarrhea. (7-1 Tr. 17:10–24; 20:7–16).  She also took three breaks totaling 28 minutes in the first 82 minutes of the deposition. (7-1 Tr. 14:1, 27:20–25, 42:6–12; 53:7–12).  After a fourth break 11 minutes later, Kaelin indicated she could not continue and was going to the emergency room.  (7-1 Tr. 60:2–14).

[19] "Every person is competent to be a witness unless [the Federal Rules of Evidence] provide otherwise." FED. R. EVID. 601. "A witness is competent to testify if she is capable of communicating relevant material and understands she has an obligation to do so." *United States v. Saenz*, 747 F.2d 930, 936 (5th Cir. 1984).

including awarding sanctions and finding her in contempt of court.

      2.      *Analysis of Motion for Sanctions*

      a.      Default Judgment

Where a party fails to comply with a discovery order, Federal Rule of Civil Procedure 37(b)(2)(A) permits the Court to strike the pleadings of and render default judgment against the disobedient party. *See Elite v. The KNR Grp.*, 216 F.3d 1080 (2000) ("The decision to strike a party's pleadings and enter default judgment is a matter within the district court's discretion . . . ."). For the Court to award default judgment as a sanction, two criteria must be met: "First, the penalized party's discovery violation must be willful.  Second, 'the drastic measure is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect.'" *United States v. Real Prop. Known As 200 Acres of Land Near FM 2686 Rio Grande City, Tex.*, 773 F.3d 654, 660 (5th Cir. 2014) (internal citations and quotations omitted).

In light of the above-detailed evidence and the Court's previous findings, the Court concludes Kaelin's conduct is willful.  She has repeatedly failed to comply with subpoenas, court orders, and the Federal Rules of Civil Procedure and Evidence.  Kaelin has not produced evidence that supports a finding of incompetence, and frankly, has established herself as a chronic malingerer and skillful manipulator.  Despite the Court's and counsel's patience—rescheduling hearings, withholding judgment to give Kaelin an opportunity to appear and respond to discovery motions, agreeing to depose Kaelin in her home,[20] rescheduling depositions, and wading through piles of medical documents, to name a few examples—Kaelin has willfully refused to fulfill her discovery obligations.

---

[20]  (Clerk's Dkt. No. 217, 229).

Moreover, because the SEC has been deprived of the opportunity to depose a key defendant in this action, the SEC will undoubtedly be prejudiced by Kaelin's conduct.  *See id.* (court may consider whether discovery violations prejudiced opposing party's preparation for trial (quoting *United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003))).  "[T]here is no evidence that, after [over 20] months of litigation, [Kaelin] would begin to comply with the court's orders regarding discovery after the imposition of some lesser sanction."  *Id.* at 660–61. Kaelin's well-documented history of evasive and manipulative conduct to avoid her discovery obligations warrants striking her pleadings and entering default judgment against her.  *Id.*  (trial court was within its discretion in granting default judgment where party did not comply with court orders and discovery motions for 17 months).

b.    Adverse Inference

In order to remedy the prejudice caused by a party's refusal to participate in discovery, Federal Rule of Civil Procedure 37(b)(2)(A)(i) permits the Court to "issue further just orders," which may include "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims."  "[A party's] refusal to testify may be used against him in a civil proceeding."[21]  *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2006) (quoting *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983))).  Although this

---

[21] As the SEC points out, the published Fifth Circuit opinions on drawing an adverse inference generally address a party's refusal to testify based on the Fifth Amendment privilege against self-incrimination.  Kaelin never stated she was refusing to testify on Fifth Amendment self-incrimination grounds.  Rather, Kaelin consistently asserted she was unable to testify due to her illnesses and the medication prescribed to her.  Nevertheless, Rule 37(b) grants the Court broad discretion to fashion an appropriate remedy in this circumstance, i.e., where a party's failure to participate in discovery is highly prejudicial to the opposing party. *See Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012) ("[D]istrict courts 'have authority to grant a broad spectrum of sanctions' under Rule 37(b) . . . ." (quoting *Chilcutt v. United States*, 4 F.3d 1313, 1323 n.23 (5th Cir. 1993))); *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1089 (5th Cir. 1979) (same).  It is also worth mentioning that other circuits, as stated above, have drawn adverse inferences against parties who refuse to participate in discovery solely for the purpose of obstructing discovery.

"adverse inference" is generally considered in the context of spoliation of evidence or the assertion of the Fifth Amendment privilege against self-incrimination, it has been applied to repeated discovery-order violations and other discovery obstruction. *See Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 84 (2d Cir. 2007) (adverse inference was proper where defendants repeatedly refused to answer discovery questions despite court-offered accommodations, including video depositions); *Tech. Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 638 (6th Cir. 2006) ("[P]laintiffs' egregious failure to comply with discovery orders supports a powerful adverse inference . . . ."); *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746–48 (8th Cir. 2004) (affirming adverse inference jury instruction for intentional prelitigation destruction of documents where it prejudiced opposing party); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109–10 (2d Cir. 2002) (vacating district court's decision refusing to draw adverse inference where "purposeful sluggishness" in producing documents requested in discovery could support an adverse inference that materials were harmful to party refusing to produce documents).

Again, due to Kaelin's repeated refusal to participate in the discovery process, the Court finds it necessary to "issue further just orders" to remedy the prejudice to the SEC. This is especially true considering the fact that Kaelin's co-defendant Helms frequently stated in his deposition that Kaelin could explain questions that Helms could not answer. The Court therefore infers, based on Kaelin's bad faith refusal to testify, that her answers to the SEC's deposition questions would have been unfavorable to her.[22]

---

[22] The SEC clarifies,"[I]t is not the SEC's position that an adverse inference alone is sufficient for summary judgment—but that the Court should consider the adverse inference along with the extensive evidence the SEC presented in its motion for summary judgment. [*SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998)] (district court granted summary judgment based on 'proof of Colello's receipt of the funds of the victims combined with an adverse inference drawn from Colello's silence.')".

### B.      Motion for Summary Judgment

The SEC contends Helms and Kaelin violated Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b–5 (collectively, "Antifraud Provisions") promulgated thereunder by engaging in a fraudulent scheme and misrepresenting material facts.  The SEC accordingly requests against both Helms and Kaelin a permanent injunction, joint and several liability for disgorgement, and a civil money penalty.  The SEC requests similar relief against Roland and Barrera, contending they too violated the aforementioned Antifraud Provisions, in addition to Exchange Act Section 15(a) ("Broker-Registration Provision").

*1.      Antifraud Provisions Violations*

Section 17(a) of the Securities Act prohibits the offer or sale of securities by use of interstate commerce:

> (1) to employ any device, scheme, or artifice to defraud;
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)–(3).  Section 10(b) of the Exchange Act empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b–5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale

23

of any security.

17 C.F.R. § 240.10b–5.

Because the basic precepts of Sections 17(a) and 10(b) and Rule 10b–5 are the same, they will be analyzed as one herein. *See SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980) ("[T]he proscriptions of section 17(a) are substantially the same as those of section 10(b) and rule 10b–5"); *see also SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008); *SEC v. Brooks*, 1999 WL 493052 at *2 (N.D.Tex. July 12, 1999).

Sections 17(a)(1) and 10(b) and Rule 10b–5 require the SEC to prove scienter.  To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009).  Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).  A showing of negligence suffices for Section 17(a)(2) or (3) violations.  *Seghers*, 298 F. App'x at 327 (citing *Aaron v. SEC*, 446 U.S. 680, 702 (1980)).

Of course, a limited partnership interest is a "security" within the meaning of the Antifraud Provisions.  *Siebel v. Scott*, 725 F.2d 995, 998 (5th Cir. 1984).  Therefore, the sales and offers for sale of limited partnership interests in the Defendant Entities are governed by the Antifraud Provisions.  Similarly, the record is replete with evidence that Helms, Kaelin, Sellers, and Barrera utilized interstate commerce, including emails, phone calls, and wire transfers, to communicate with investors.  *See SEC v. Spinosa*, 31 F. Supp. 3d 1371 (S.D. Fla. 2014) (Florida defendant's receipt of email from Ponzi operator and defendant's misrepresentations to Texas investor established use of interstate commerce).  Therefore, the following analysis will focus on whether Helms and Kaelin engaged in a fraudulent scheme and whether Helms, Kaelin, Sellers, and Barrera made material

24

misrepresentations within the meaning of the Antifraud Provisions.

a.   Helms and Kaelin

i.   *Scheme to Defraud*

A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)).  Put another way, in a Ponzi scheme, investors are promised high returns on their investments, and prior investors are paid distributions from new investors' contributions, rather than a legitimate, underlying business concern.  *See Janvey v. DSCC, Inc.*, 712 F.3d 185, 188 n.1 (5th Cir. 2013) ("A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008))).  Similarly, commingling of funds is a common characteristic of a Ponzi scheme.  *In re LLS Am., LLC*, 2013 WL 3305393, at *7 (Bankr. E.D. Wash. Jul. 1, 2013).

As described above, the SEC proffers sworn declarations of two forensic accountants who each independently concluded that Helms and Kaelin paid royalty dividends to old investors with new investor funds from 2011 until mid-2013.[23]  This is the hallmark of a Ponzi scheme. *See United States v. Setser*, 568 F.3d 482, 486 (5th Cir. 2009) ("[I]n a classic Ponzi scheme, as new investments [come] in . . . , some of the new money [is] used to pay earlier investors.").  Although the evidence

---

[23]  As the SEC asserts, the forensic accountants' sworn declarations provide "clear, numerical support" that Helms and Kaelin were responsible for these Ponzi payments.  *See Alguire*, 647 F.3d at 597–98 (finding sufficient evidence of substantial likelihood of success that company operated as Ponzi scheme where declarations "provide clear, numerical support for the creative reverse engineering undertaken . . . to accomplish the Ponzi scheme").

shows Helms and Kaelin used some of the investments to purchase royalty interests, the existence of a Ponzi scheme is not negated. Engaging in some legitimate business operations does not counteract the existence of a Ponzi scheme because the distributions made to investors were nevertheless funded by other investors' money. *See DSCC, Inc.*, 712 F.3d at 188 (finding Ponzi scheme where vast majority of money raised was not used to invest in securities); *In re Twin Peaks Fin. Serv's Inc.*, 516 B.R. 651, 655 (Bankr. D. Utah 2014) ("The fact that an investment scheme may have some legitimate business operations is not determinative. If the debtor's legitimate business operations cannot fund the promised returns to investors, and the payments to investors are funded by newly attracted investors, then the debtor is operating a Ponzi scheme."). The evidence provided by the SEC establishes that Helms and Kaelin repeatedly misappropriated investor funds to make Ponzi payments. The SEC has therefore established that Helms and Kaelin operated a Ponzi scheme, which is, by definition, a "fraudulent scheme." *See Quilling v. Schonsky*, 247 F. App'x 583 (5th Cir. 2007) (Receiver's affidavit is sufficient evidence to establish existence of Ponzi scheme).

The SEC also proffers uncontroverted evidence that Helms admitted he and Kaelin controlled the operations of the Defendant Entities and how the investor funds were spent. Moreover, Helms admitted in his deposition that he and Kaelin purposefully used the final investment in Iron Rock to buy out a Vendetta Partners investor. This knowing misappropriation of investor funds for Ponzi payments supports a finding of scienter.

*ii.     Material Misrepresentations*

"A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Seghers*, 298 F. App'x at 328 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002)).

26

Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir.1994).

The SEC contends it offers evidence Helms and Kaelin misrepresented or omitted material facts regarding: (1) how investor funds would be used; (2) their professional backgrounds; (3) litigation involving themselves and affiliated entities; and (4) the value of the Vendetta Portfolio and whether it had been audited.

The evidence presented clearly supports that Helms and Kaelin used investor funds for purposes other than the "purchase costs of royalty interests," "loan repayment," and "promotional expenses" they represented in the PPM. Rather, as evinced above, Helms and Kaelin used investor funds for personal expenses, business expenses (apparently to prevent the collapse of the Ponzi scheme), and Ponzi payments to investors (apparently to perpetuate the Ponzi scheme). *See SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) (affirming summary judgment where defendant misappropriated $3,000,000 of investor funds for personal use); (*see also* Parks Declaration at 88:1–89:2 (stating he would not have invested had he known his investment would be used to buy our a Vendetta Partners investor)). The evidence also supports Helms made misrepresentations about his experience with mineral companies and royalty interests.[24] Similarly, Kaelin made misrepresentations about her experience working for Sandefer and his provision of his "rolodex of wealthy industry and business contacts" and "proprietary software."[25] APP0340–53. *See SEC v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) ("There c[ould] be no doubt that . . .

---

[24] Helms admitted in his deposition that he had no prior experience with any mineral company. Rather, his experience focused on tax and estate planning, rather than royalty interest management and acquisition. APP0043–45; (Helms Depo. 23:10–32:6).

[25] Again, Sandefer's email to Kaelin states, "I consider [the representations made about Kaelin's work for Sandefer] to be highly misleading and ask you to stop using my name immediately. You were not hired to manage royalty mineral rights nor did I provide you a "rolodex" or proprietary software." APP0355.

misrepresentations [involving] educational backgrounds [and] professional experience [were material]").

As to the litigation involving Helms, Kaelin, and the affiliated entities, the Iron Rock and Vendetta Partners PPMs establish Helms and Kaelin affirmatively and falsely stated there was no material pending legal proceedings against them. *See Kunz v. SEC*, 64 F. App'x 659, 666 (10th Cir. 2003) (litigation history omitted from PPM was important to investors' decisions to purchase investment products). Finally, the false audit letter supports both a finding that Helms and Kaelin misrepresented that Vendetta Partners portfolio had been audited and a finding that it had been valued over $26 million. *See Cox v. Collins*, 7 F.3d 394, 396 (4th Cir. 1993) (affirming judgment as a matter of law that financial health of corporation was material); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (information regarding financial condition, solvency, and profitability was material).

The evidence also establishes that Helms and Kaelin knew their misstatements were false. For example, again, they knowingly used investor funds to pay for things not specified in the PPM, including personal expenses. Helms admitted he lied about his professional background. Although Kaelin did not directly admit she lied about her professional background, circumstantial evidence shows she sent an email containing false information about her background to investors, she was confronted by Sandefer about the false information, and she denied creating or sending the false information about her background. Helms and Kaelin also knowingly made misrepresentations through the PPM (which they both supplied to potential investors) about litigation against themselves and affiliated entities, as they were clearly served with process in those lawsuits and had knowledge of them.

28

Finally, circumstantial evidence that the audit report was fabricated and was proffered solely by Helms and Kaelin to investors establishes that Helms and Kaelin knew the valuation and other audit information was false. Because both Helms and Kaelin sent the false audit report to potential investors, they each had scienter. *See Aubrey v. Barlin*, 2010 WL 3909332, at *8–9 (W.D. Tex. Sept. 29, 2010) (seller's representation that collateral was worth $465,000 when seller personally observed collateral was worth $135,000, and seller "made a great deal of money as a result of these false statements," established seller's scienter at motion to dismiss stage).

In light of the above, the SEC has established Helms and Kaelin used interstate commerce to perpetuate a securities-fraud scheme and made material misrepresentations of facts relating to the offer and sale of securities. Helms and Kaelin therefore violated Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b–5 promulgated thereunder.

### b.    Sellers and Barrera

The SEC contends Sellers and Barrera violated the Antifraud Provisions by making material misrepresentations regarding their compensation. Sellers' and Barrera's representation that their commission would be "small" was misleading.[26] A $423,500.00 commission is hardly "small." More importantly, the commissions were nearly 14% of the investment, more than eight times the PPM's $50,000 limit for total promotional expenses. When Sellers and Barrera presented Moore with the PPM containing this limit, they represented to him that they would receive up to and not

---

[26] Sellers made an affirmative misrepresentation regarding himself and Barrera. Barrera heard the misrepresentation and said nothing, thus ratifying the misrepresentation. However, even if Barrera's silence did not ratify Sellers' statement, he had a duty to disclose due to his fiduciary duty to Moore and Lacova. Silence, absent a duty to disclose, does not violate section 10(b) and Rule 10b–5. *Chiarella v. United States*, 445 U.S. 222, 228 (1980). Under the federal securities laws, a duty to disclose "arises from the relationship between the parties." *Dirks v. SEC*, 463 U.S. 646, 658 (1983). Such duty attaches when "a fiduciary or other similar relation of trust and confidence" exists. *Id.* at 225. Sellers and Barrera owed Moore a fiduciary duty by practicing as brokers, even though they were unlicensed. *See SEC v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (holding unregistered broker to the same standard of care as a registered broker and explaining that a broker's recommendation implies that a reasonable investigation has been made and that the recommendation rests on the conclusions of that investigation).

exceeding $50,000.00 for soliciting his investment—nowhere near the combined $423,500.00.  This alarmingly high sum presents a conflict of interest in two ways.  One, a reasonable investor would want to know if the broker offering the security was receiving a high sum.  This is supported by the fact that Moore directly asked Sellers and Barrera what their commission would be. Two, Moore would want to know if a broker was benefitting to the detriment of the limited partnership (due to the violation of the PPM).  "It is indisputable that potential conflicts of interest are 'material' facts with respect to clients and the [SEC]."  *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir. 2003) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 201 (1963)).  *See, e.g., Capital Gains*, 375 U.S. at 201 (investment advisors required to "fully and fairly reveal[] [their] personal interests in [their] recommendations to their clients"). The misrepresentation was therefore material.  *See Kaufman & Enzer Joint Venture v. Dedman*, 680F. SUpp. 805, 812 (W.D. La. 1987) ("commission arrangement" was material).

Sellers and Barrera, even as unlicensed brokers,[27] owed Lacova, via Moore, a fiduciary duty. *See Rolf v. Blyth Eastman Dillon & Co., Inc.*, 424 F. Suppp. 1021, 1036 (S.D.N.Y. 1977) (listing cases holding that brokers, by virtue of their position, owe fiduciary duties to customers).  They accordingly owed a duty to disclose any potential conflicts of interest to Moore—not deflect his question about potential commissions in a misleading way. Moreover, Sellers admitted he had "no basis" to make representation to Moore that the commission would be "small." *See SEC v. Hasho*, 784 F. Supp. 1059, 1107–08 (S.D.N.Y. 1992) (broker is not shielded from liability if even if he actually believed representations which he had no adequate basis to make).  The fact that Sellers and Barrera both admitted to receiving the PPM and providing Moore with the PPM charges them with

---

[27] See discussion of Sellers's and Barrera's broker status *infra*.

knowing that their commissions were excessive.  Therefore, at the very least, Sellers and Barrera acted with severe recklessness in failing to know that their commission was a violation of the PPM to the detriment of all limited partners at Vendetta Partners. *SEC v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (holding unregistered broker to the same standard of care as a registered broker and explaining that a broker's recommendation implies that a reasonable investigation has been made and that the recommendation rests on the conclusions of that investigation).  This supports a finding of scienter.  Because Sellers and Barrera made material misrepresentations and breached their fiduciary duty to Moore with scienter, their conduct was a violation of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b–5 promulgated thereunder.

### 2. *Broker Provisions*

The SEC contends Sellers and Barrera violated the Broker Provisions by acting as unregistered brokers.  It is undisputed that neither is registered with the SEC as a broker pursuant to Section 15(a) of the Exchange Act.  Section 15(a) states:

> unlawful for any broker or dealer ... to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security ... unless such broker or dealer is registered.

15 U.S.C. § 78o(a)(1).  Scienter is not an element of § 78o(a)(1). *SEC v. Rabinovich & Assocs., LP*, 2008 WL 4937360, at *5 (S.D.N.Y.  Nov. 18, 2008); *see also Eastside Church of Christ v. Nat'l Plan*, Inc., 391 F.2d 357, 361–62 (5th Cir. 1968) (without making finding of scienter, finding that defendant violated § 78o(a)(1)).

A broker is "any person engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(a)(4).   Section 15 of the Exchange Act does not define the phrase "engaged in the business." Various courts have described the conduct that constitutes being

"engaged in the business" of "effecting transactions in," or "buying and selling," securities. (internal

quotation marks and citations omitted).   To determine whether a person falls within this definition,

courts consider whether the person may be "characterized by a certain regularity of participation in

securities transactions at key points in the chain of distribution." *S.E.C. v. Martino*, 255 F. Supp. 2d

268, 283 (S.D.N.Y. 2003).  Courts also have considered whether the person:

> (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3)
> is selling, or previously sold, the securities of other issuers; (4) is involved in
> negotiations between the issuer and the investor; (5) makes valuations as to the
> merits of the investment or gives advice; and (6) is an active rather than passive
> finder of investors.

*Id.*  (internal citations omitted).

The Exchange Act likewise does not define "effecting transactions" for the purposes of being

a broker. In determining whether a person "effected transactions," courts consider several factors,

such as whether the person: (1) solicited investors to purchase securities, (2) was involved in

negotiations between the issuer and the investor, and (3) received transaction-related compensation.

*SEC v. Earthly Mineral Solutions, Inc.*, 2011 WL 1103349, at *3 (D. Nev.  Mar. 23, 2011) (citing

*SEC v. Hansen*, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984)); *see also SEC v. U.S. Pension Trust Corp.*,

2010 WL 3894082, at *21 (S.D. Fla. Sept. 30, 2010) (compiling list of 11 factors courts consider

when determining whether someone is a broker).

### i.     Sellers

The SEC analogizes Sellers' activities as analogous to those in *SEC v. StratoComm Corp.*

2 F. Supp. 3d 240 (N.D.N.Y. 2014).  In *StratoComm*, an employee of the defendant entity's primary

responsibility was to solicit investors to purchase the defendant entity's securities.  He contacted

investors, relayed the transaction terms, and received transaction-based compensation in the form

of a "discretionary bonus that depended on how much money he raised."  *Id.* at 263.  The Court in

that case found the unlicensed employee " regularly engag[ed] in the business of effecting transactions in securities for the accounts of others in exchange for transaction-based compensation" in violation of Section 15(a).  *Id.* at 262–63.

Similarly, Sellers was hired to solicit investors to purchase limited-partnership interests in Vendetta Partners.  He contacted and negotiated with investor Moore, relayed the transaction terms, and received  a transaction-based bonus (that was rather large) that depended on how much money he raised.  Sellers also offered for sale securities in Vesta and Iron Rock with the expectation that he would receive a bonus if successful.  Because Sellers has failed to respond to the motion with any legal authority or evidence to the contrary, the undersigned finds *StratoComm* to be analogous.  Sellers was therefore a broker for the purposes of Section 15(a) of the Exchange Act and was required to register as a broker.

### ii.    *Barrera*

Barrera was not an employee of Vendetta, rather, he was recruited by Sellers.  Barrera actively sought to induce Lacova, through his friend Moore, to invest in Vendetta.  Barrera himself identified Lacova as a prospective investor and arranged the meeting with Moore.  He participated in negotiations at the meeting and continued to act as a negotiator–intermediary by briefing Vendetta of Moore's concerns.  In addition, Barrera appears to have played a role in offering Vesta securities to Moore and expected to receive compensation therefrom.  Barrera's conduct is therefore similar to the unlicensed broker in *StratoComm*: he contacted and negotiated with Moore, relayed the transaction terms, and received a transaction-based bonus.  Although it could be argued Barrera was not necessarily participating in securities transactions "regularly," he was hired by Sellers to conduct these types of negotiations "regularly."   He also played a central role in securing a hefty $3,050,000.00 investment from Lacova.  *See SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12–13

(D.D.C. 1998) (regularity of participation can be shown also by "such factors as the dollar amount of securities sold . . . and the extent to which advertisement and investor solicitation were used").

In light of the above, Sellers and Barrera were brokers within the meaning of Section 15(a) of the Exchange Act.  They were therefore required to register as such.  *See, e.g., SEC v. Offill*, 2012 WL 246061, at *8 (N.D. Tex.  Jan.  26, 2012) (concluding parties were dealers where alleged dealers did not respond to SEC's claim that they were dealers, and SEC produced evidence that they used instrumentalities of interstate commerce in acting as unregistered dealers).  Because of their failure to do so, they violated Section 15(a).

### 3.     *Relief Requested*

#### a.     Permanent Injunction

Section 21(d) of the Exchange Act allows for the entry of permanent injunctions in enforcement actions brought by the Commission when the evidence establishes a "reasonable likelihood" that a Defendant will engage in future violation of the securities laws. See 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *Murphy*, 626 F.2d at 655. "[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *Zale Corp.*, 650 F.2d at 720; *see SEC v. Caterinicchia*, 613 F.2d 102 (5th Cir.1980); *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978). In predicting the likelihood of future violations, courts evaluate the totality of the circumstances. *Zale Corp.*, 650 F.2d at 720.

When evaluating SEC requests for injunctive relief, courts consider: (1) the egregiousness of the defendant's conduct; (2) the degree of scienter; (3) the isolated or recurrent nature of the violation; (4) the sincerity of the defendant's recognition of his transgression; and (5) the likelihood

of the defendant's job providing opportunities for future violations. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *Blatt*, 583 F.2d at 1334.

i.      Helms and Kaelin

Considering the vast amount of capital invested for Helms and Kaelin's personal gain, the 129 duped investors, and the repeated affirmative misrepresentations here, Helms' and Kaelin's conduct was  particularly egregious.  As noted above, Helms and Kaelin had a high degree of scienter, consistently manipulating and lying to investors to perpetuate their Ponzi scheme. Moreover, that the violations were recurrent and spanned a significant period of time weighs in favor of a permanent injunction.  Neither Helms nor Kaelin recognized their transgressions, in fact, Helms denied wrongdoing in his deposition, and Kaelin's refusal to testify has warranted a presumption against her.  Finally, Helms and Kaelin could very well begin soliciting susceptible and non-sophisticated investors, who would not be savvy enough to research litigation against Helms and Kaelin, for a new scheme.  *See SEC v. Cavanagh*, 2004 WL 1594818, at *28 (S.D.N.Y.2004) (commission of past illegal conduct is highly suggestive of likelihood of future violations).  All five permanent injunction factors weigh heavily in favor of granting the permanent injunction. Accordingly, a permanent injunction against Helms and Kaelin enjoining them from engaging in future violations of securities laws is warranted.  *See SEC v. Global Telecom Serv's, L.L.C.*, 325 F. Supp. 2d 94, 120–21 (D. Conn. 2004) (permanent injunction granted where systematic securities violations, substantial evidence of scienter, refusal to admit wrongdoing, and substantial investor losses).

ii.     Sellers and Barrera

Sellers and Barrera made an affirmative misrepresentation to Moore when he asked directly about their commissions.  That Sellers and Barrera owed Moore a fidiciuary duty at the time this

misrepresentation makes their misrepresentation egregious and weighs in favor of issuing a permanent injunction.  Sellers and Barrera were at least "severely reckless," in making their representations, and violated several securities laws by acting as unlicensed broker–dealers, which also supports issuing a permanent injunction.  Sellers' and Barrera's violations were not particularly repetitive or numerous, weighing against issuing a permanent injunction.  However, Sellers and Barrera have not expressed remorse or recognized their transgressions.  In addition, they have shown themselves capable of soliciting and negotiating with investors for millions of dollars in securities transactions.  Sellers' and Barrera's conduct pales in comparison to Helms' and Kaelin's, nevertheless, the factors weigh in favor of granting a permanent injunction.  Having received no response or arguments from Sellers or Barrera, the Court finds a permanent injunction enjoining them from engaging in future violations of securities laws is warranted.

b.    Joint and Several Liability for Disgorgement

The court has broad discretion to award disgorgement and, if so, the amount of any award. *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993). The purpose of this remedy is to deprive the party or parties responsible for the fraud of their gains and to deter future violations of the law. *Id.* at 76 n. 8. Regarding the calculation of a disgorgement figure, the Fifth Circuit has stated that "[t]he court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *Blatt*, 583 F.2d at 1335. This "profit," however, is not derived from a wrongdoer's ultimate enrichment after business and other expenses are deducted.  *Seghers*, 298 F. App'x at 336; *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 16 (D.D.C. 1998) (noting the "overwhelming weight of authority" holding that securities law violators may not offset their liability with business expenses).

36

Rather, the defendant is subject to disgorging a reasonable approximation of the proceeds causally connected to the wrongdoing. *Seghers*, 298 F. App'x at 336 ("A defendant is not immune from disgorgement merely because he has spent or lost the proceeds of his fraudulent scheme."); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C.Cir. 2000) (holding that disgorgement establishes a defendant's personal liability to pay an amount equal to wrongfully-obtained sums, regardless of the disposition of the original assets). "[A]ny risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995).

"An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness." *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir. 1975), rev'd on other grounds, 430 U.S. 1 (1977). In calculating this sum, the court generally turns to the Internal Revenue Service's underpayment rate related to income tax arrearages. 26 U.S.C. § 6621(a)(2); *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007). Courts likely will order joint and several liability against defendants as to the disgorgement figure plus interest when "two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *see also SEC v. First Jersey*, 101 F.3d 1450, 1475 (2d Cir. 1996).

i.     Helms and Kaelin

The SEC requests the Court hold Helms and Kaelin jointly and severally liable for disgorgement in the amount of $31,422,861—the amount of funds invested by individuals as a direct result of their scheme to defraud. As the Court found herein, the evidence establishes the Ponzi scheme operated by Helms and Kaelin realized proceeds in this amount. Therefore, Helms and

Kaelin are jointly and severally liable for disgorgement of $31,422,861. *See SEC v. Halek*, 537 F. App'x 576, 581–82 (5th Cir. 2013) (affirming district court's finding that individual defendant was jointly and severally liable for disgorgement for all ill-gotten profits realized by individual defendant and two companies; "how [the ill-gotten profits were] distributed and spent 'has no relevance to the disgorgement calculation'" (quoting *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1116 (9th Cir. 2006))).

The SEC requests prejudgment interest on any award of disgorgement from the date of the first violation (June 26, 2011) through the date of the instant motion (June 30, 2015). Because the Court has awarded the SEC disgorgement of Helms and Kaelin's ill-gotten gains, prejudgment interest is appropriate. Prejudgment interest in the requested amount of $3,873,043.00 is therefore awarded. APP0835 (prejudgment interest report). Moreover, because the evidence has established that Helms and Kaelin had a close relationship in engaging in the illegal conduct, they should be jointly and severally liable for the prejudgment interest.

### ii.    Sellers and Barrera

The SEC requests the Court hold Sellers and Barrera jointly and severally liable for disgorgement in the amount of $423,500.00, which is the combined total of their commission for securing the Lacova investment. The evidence establishes Sellers and Barrera received this combined amount as a result of their unlawful conduct. Therefore, disgorgement in this amount is appropriate. SBAPP 119 (prejudgment interest report). The evidence establishes Sellers and Barrera worked closely as a team to solicit and secure the Lacova investment. Therefore, they should be jointly and severally liable for disgorgement of $423,500.00. Prejudgment interest in the amount of $36,243.87 was requested, dating from July 27, 2012 (the initial meeting with Moore), and should be awarded in that amount.

b.      Civil Money Penalty

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange act authorize the Court to assess civil money penalties against natural persons.  15 U.S.C. §§ 77t(d), 78u(d).  There are three tiers of penalties, each one with its own required showing.  The third tier requires a finding that the defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d).  The penalty imposed shall not exceed the greater of $100,000 (plus inflation adjustment) or the "gross amount of pecuniary gain to such defendant as a result of the violation . . . ."  15 U.S.C. §§ 77t(d), 78u(d); *see* 17 C.F.R. 201.1004–05 (increasing statutory amounts to reflect inflation; 2012 adjusted to $150,000 and 2013 adjusted to $160,000).

Monetary penalties are designed to serve as deterrents against securities law violations, in contrast with disgorgement, which primarily aims to remove a defendant's profit from illegal transactions and which "merely places the offender in the same position he would have been in had he not committed the offense." *SEC v. Lipson*, 129 F.Supp.2d 1148, 1159 (N.D.Ill.2001).  To determine civil penalties, a court considers the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Offill*, 2012 WL 1138622, at *3 (N.D.Tex. Apr.5, 2012) (citations omitted).  *See also SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir. 2003) (listing similar factors).

i.      Helms and Kaelin

39

The SEC requests the Court "order Helms and Kaelin each to pay a third-tier civil penalty up to the maximum amount allowable," which the Receiver has suggested is "at least $31,422,861, the gross investment proceeds." (SEC Mot. at 20). As the Court found above, Helms and Kaelin's violations were egregious, and involved fraud, deceit, and manipulation on a massive scale in clear disregard of federal securities laws. In addition, Helms and Kaelin's violations directly resulted in substantial losses or created a significant risk of substantial losses to their former investors.[28]

However, the SEC did not specify how the proposed $31,422,861.00 civil penalty should be divided between Helms and Kaelin, or whether the penalty should be awarded on a joint and several basis.[29] Moreover, in light of the significant disgorgement ordered herein, the Court declines to award the maximum penalty requested. *See SEC v. StratoComm Corp.*, __ F. Supp. 3d__, 2015 WL 1013792, at *11 (N.D.N.Y. Mar. 9, 2015) (declining to order maximum third-tier civil penalty where financial disgorgement and prejudgment interest ordered were "substantial," and defendant's impaired financial worth was mitigating factor).

Instead, the Court finds it appropriate to impose a penalty in the amount that Helms and Kaelin's misappropriated investor funds were used for personal enjoyment and personal expense. The SEC has proven that Helms and Kaelin misappropriated at least $8,442,116.00 for spending on themselves, their families, friends, and associates. APP0013. Accordingly, the undersigned finds it just that Helms and Kaelin each pay a penalty in the amount of $4,221,058.00—half of the total misappropriation of investor funds applied for personal use.

ii.    Sellers and Barrera

---

[28] Neither Helms nor Kaelin has presented evidence of their current financial conditions.

[29] The SEC provides no authority regarding whether a civil money penalty can be imposed on a joint and several basis, and the Court cannot find any authority on the matter.

The SEC requests third-tier penalties in the amount of $212,500.00 for Sellers and $211,000.00 for Barrera because their misconduct caused investor losses exceeding $3 million. Moreover, Sellers and Barrera breached their fiduciary duty to Moore and Lacova, which is particularly egregious. Nevertheless, although Sellers and Barrera caused a significant loss, their conduct was not repetitive, and they acted with severe recklessness, rather than outright intention. A penalty should be issued in order to deter Sellers and Barrera from future violations in light of their apparent lack of remorse, but it should not equal the disgorgement amount. Because Sellers and Barrera violated securities laws in 2012, the low end of the statutory spectrum would assess penalties against them in the amount of $150,000.00 each. 17 C.F.R. 201.1004–05. Accordingly, a civil penalty in the amount of $150,000.00 against each Sellers and Barrera is appropriate to deter them from future securities violations.

## V.   ORDER

Accordingly,  Plaintiff's Motion for Sanctions against Defendant Janniece Kaelin (Clerk's Dkt. No. 264) is hereby **GRANTED**;

Plaintiff's Motion for Summary Judgment against Robert Helms and Janniece Kaelin, (Clerk's Dkt. No. 258) is further **GRANTED**;

Plaintiff's Motion for Summary Judgment against Defendants Deven Sellers and Roland Barrera (Clerk's Dkt. No. 260) is further **GRANTED**.

Plaintiff the Securities and Exchange Commission is hereby **ORDERED** to file with this Court on or before **Friday, September 4, 2015**, and serve upon the parties as appropriate a proposed final judgment detailing the terms of:

(1)     the proposed permanent injunctions against each defendant specified herein;

(2)      the disgorgement awards against each defendant specified herein, including the prejudgment interest awards;

(3)      the civil money penalty awards each defendant specified herein.

The proposed final judgment must make proposals in accordance with the findings in this order, including the award amounts.  Furthermore, the proposed final judgment should specify the methods and details of payment.

Finally, Plaintiff the Securities and Exchange Commission is hereby ORDERED to file an advisory to the Court detailing the remaining causes of action and defendants against whom they are asserted, if any.   In addition, the advisory should notify the Court of any further action it foresees to be necessary in this action.  The Court acknowledges that the Receiver in this matter continues to perform his duties as required to benefit the Receivership Estate.

**SIGNED** on August 21, 2015.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE